GILLIE GLASCOCK and EMMET GLASCOCK, a Minor, by GILLIE A. GLASCOCK, Guardian, v. MELVIN GLASCOCK and G. M. GLASCOCK, Appellants.

Division Two, March 9, 1909.

1. **DEED: From Wife to Husband: Fraud.** A married woman is legally competent to convey her real estate to her husband without the intervention of a third party. And a deed made by her to him, for the expressed consideration of one dollar, which was not paid, upon his representation to her that, there being no children, if both died, the property would go to her heirs, and she deeming that unfair executed the deed in order that if either died the other might have the use of the property, cannot, after the title has passed into third parties, who knew nothing of those representations, be set aside as fraudulent.

2. ————**: Duress: Evidence.** Plaintiff testified that her husband told her that unless she signed a deed to lots in Dexter he would kill her, but on cross-examination she testified that "he did not come right out and tell me, but he told me to get myself ready and go to Essex and sign that deed, and I did." The notary who took her acknowledgment wrote into the certificate that, She "said she assigned that was enough," and testified that, when he propounded the usual questions, "she said she had signed the deed and that was sufficient." There was no evidence that the grantee knew of the threats or duress. *Held*, insufficient to authorize a cancellation of the deed, although the husband afterwards became insane.

3. **MORGAGE: Cancellation: Duress.** A note bearing the genuine signatures of the makers imports that the payee furnished the consideration therein named, and the burden is on the maker to show the contrary; and where a suit is brought to cancel the mortgage securing the note upon the ground of duress the court requires clear, cogent and convincing evidence establishing the fact. And where one of the makers (a wife) testifies that she signed the note and mortgage under duress of the other (her husband), and that she knew nothing about whether her husband got the money or not, and defendant shows that he not only furnished the money and at plaintiff's written request, but that the deed of trust was freely executed by her, that his act in furnishing the money was one prompted by brotherly affection, and that the whole transaction consists with good faith and fair dealing, the mortgage will not be cancelled.

4. ————: **Insurance Money.** Where there was a valid deed of trust, insurance money arising out of a destruction of a house on the mortgaged lot cannot be awarded to the mortgagor.

5. ————: **Dower.** Where there is a valid deed of trust and the mortgagee buys the property at the foreclosure sale, the court cannot decree that one of the mortgagors is entitled to dower in the property. Where she alleges that by agreement between her and the mortgagee he was to buy in the property for her, if she is entitled to anything it is to redeem the whole property by paying to the mortgagee his outlay in acquiring the title at the trustee's sale, and not to dower therein.

Appeal from Stoddard Circuit Court.—*Hon. J. L. Fort,*
Judge.

REVERSED (*with directions*).

*Wammack & Welborn* for appellants.

(1) In an equity case the appellate court will review the finding of the chancellor on questions of fact. Hoeller v. Haffner, 155 Mo. 589; Kinney v. Murray, 170 Mo. 707; State ex rel. v. Jarrott, 183 Mo. 219; Myers v. Schuchman, 182 Mo. 177; Bell v. Campbell, 123 Mo. 20.  (2) And will enter final judgment for the party entitled to judgment. Mill Co. v. Sugg, 169 Mo. 135.  (3) When a grantor in a deed of land seeks its cancellation and the reinvestment of title on the

ground of fraud, duress or mistake, the *onus* of establishing the same is on such grantor, and before the relief asked will be given the fraud, mistake or duress must be established by clear and convincing evidence Keiser v. Gammon, 95 Mo. 224; Jackson v. Wood, 88 Mo. 76; Bryan v. Hitchcock, 43 Mo. 527; Trust Co. v. Browne, 177 Mo. 412; Davis v. Lister, 64 Mo. 46; 6 Cyc. 336. (4) This class of cases is analagous to that class where a resulting trust is sought to be established by parol evidence. Jackson v. Wood, 88 Mo. 78. (5) A decree and finding in equity must be consistent with, and embraced within, the pleadings and proof. Ross v. Ross, 81 Mo. 84; Newham v. Kenton, 79 Mo. 382.

*Keaton & Keaton* for respondents.

(1) Mrs. Glascock was a competent witness as to her husband's threats upon her life by which the fraud was perpetrated against her and the undue influence exercised over her resulting in the wrongs. Hatch v. Rollins, 158 Mo. 190. Melvin Glascock was an incompetent witness to testify to the many transactions and the dealings and contracts he had with L. O. Glascock, who had been insane for about ten years, who is dead and was dead at the time of the trial. R. S. 1889, sec. 4652. (2) In this equity case the appellate court will review the findings of the chancellor on the question of fact, and render a final judgment for the party entitled to the decree "or give such judgment as such court ought to have given, as to them shall seem agreeable to law." R. S. 1899, sec. 866. The trial court should have set aside the two warranty deeds for the eighty acres of land and lot 10 in Dexter, which were represented to plaintiff Gillie A. as mortgages, and have ordered the property sold, and an account taken between the parties as to the several amounts advanced by defend-

ant, Melvin Glascock, and the eighty acres of
land being sufficient to pay all such claims
nearly twice over, and defendant having agreed with
plaintiff and said he would make it pay all the debts,
it should have been so applied and have left all the
other property unincumbered for the benefit of plain-
tiffs. State ex rel. v. Jarrott, 183 Mo. 218. (3) In
this case the trust and confidential relations between
the parties, as well as the insanity of Dr. L. O. Glas-
cock, is proven beyond a reasonable doubt; "the fraud,
mistake or duress is established by clear and convinc-
ing evidence, and the burden of proof is wholly on the
defendants." Dingman v. Romine, 141 Mo. 480; Mowry
and Kettering v. Norman, 204 Mo. 194; Bradford v.
Blossom, 207 Mo. 229; Jackson v. Wood, 88 Mo. 76;
Dausman v. Rankin, 189 Mo. 677; Strong v. Whey-
bark, 204 Mo. 348; Roberts v. Bartlett, 190 Mo. 700.
The findings and decree of the court were all within
the issues presented by the pleading and evidence, as
far as they went, and should be extended to do com-
plete justice, as the court of equity had grasp and
jurisdiction of the subject-matter and of the parties.
Real Est. Sav. Inst. v. Collonious, 63 Mo. 295; Snyder
v. Arn, 187 Mo. 175.

GANTT, P. J.—This is a suit in equity by the
widow and minor son of Dr. L. O. Glascock, deceased,
against Melvin Glascock and G. M. Glascock, his
brothers, to have certain deeds and conveyances ex-
ecuted by her deceased husband and herself declared
fraudulent and void on account of the alleged fraudu-
lent acts of the defendants and on account of duress
by threats, and to divest the title out of the defendant
Melvin Glascock in and to certain real estate and
vest the same in plaintiffs.

The petition alleges that said L. O. Glascock and
plaintiff Gillie were at the time of his death husband
and wife and the plaintiff Emmet their only son, and

that at that time Doctor Glascock and the plaintiff Gillie were the owners in fee of all of lots numbered 1, 4 and 6 and out-lot 3 in block 26, and of lot numbered 10 in block 2 of Deal & Boughton's addition to the city of Dexter, and lot numbered 1 of the northwest quarter of section 4, and all of the land west of Bess Slough in the northwest corner of section 3, all in township 24, range 11, and all in Stoddard county, Missouri. That the plaintiff, Gillie Glascock, was the owner in her own right of all of lots one, four and six in block 26, in the city of Dexter, and that plaintiff earned money by her separate labor and from time to time furnished her said husband sums of money; that the said L. O. Glascock was a practicing physician and earned good money, and that their joint means purchased their property; that the above real estate of the plaintiffs and the property purchased by the said L. O. Glascock by and with the means aforesaid was of the value of $4,500, and that the same was fully paid for and free of all incumbrances; that about and prior to 1895, Doctor Glascock began to lose his mind and was finally adjudged insane and incapable of transacting business and confined in the insane asylum at Fulton on the 17th of November, 1901, where he died on June 17th, 1903. It is further alleged that when Doctor Glascock began to lose his mind, he became dangerous and threatening towards the plaintiff Gillie, and he seemed to be seized with an unnatural design to strip the plaintiffs of their property, and bestow it upon the brother, Melvin Glascock, and when his wife remonstrated with him, he said to her, "You will sign all papers I want you to or I will kill you." It is then alleged that Doctor Glascock colluded with the defendant Melvin to enable the latter to obtain deeds of conveyance of all the property of the plaintiff Gillie and the doctor. The petition then alleges specifically that in pursuance of the said collusion and design on November 27, 1895, Melvin Glascock came from

Tennessee to Missouri, and soon after a conference with Doctor Glascock, Doctor Glascock executed a warranty deed conveying lot ten in block 2 of Deal & Boughton's addition to the city of Dexter to the defendant Melvin for the alleged consideration of three hundred dollars, and represented the same to be a mortgage to secure a certain sum of money; that plaintiff Gillie refused to sign and execute the same and thereupon the doctor declared and threatened that if she did not sign and execute the same he would kill her; that under fear of this threat she executed the said deed, which she afterwards learned was a warranty deed, for which she received no consideration, and that the same was procured by duress for the purpose of investing the title in Melvin.

It is then alleged that on November 27, 1895, by like fraudulent representations and by like means and the same threats and without consideration another warranty deed was procured from Doctor Glascock and plaintiff Gillie to Melvin conveying lot numbered 1 of the northwest quarter of section 4, township 24, range 11, for the pretended consideration of five hundred dollars.

That on July 8, 1897, by the same means of duress, a warranty deed was obtained from the plaintiff Gillie directly to her husband, Dr. L. O. Glascock, for the pretended consideration of one dollar, which was never paid, purporting to convey all of lots numbered 1, 4 and 6 in block 26, in the city of Dexter.

For practically the same causes the following other conveyances were assailed in the bill: A deed of trust from plaintiff Gillie to L. O. Glascock to Melvin Glascock dated November 8, 1897 conveying lots one, four and six and out-lot three in Dexter, and purporting to be given to secure a note of $725 due two years after date; a warranty deed from plaintiff Gillie and her husband to defendant G. M. Glascock of date December 10, 1900, and a deed of the same date from

G. M. Glascock to L. O. Glascock to lots one, four and six and out-lot three in block 26 in Dexter.

It is then alleged that at the time of Doctor Glascock's death the premises including all west of Bess Slough in the northwest corner of lot two of the northwest quarter of section 3, township 24, range 11, and known as Mill property, was incumbered by a deed of trust of $125 and plaintiff Gillie desiring that the same should be sold, the defendant Melvin agreed to have it advertised and sold under the deed of trust and to buy it in for her, but instead of so doing, Melvin bought in the property in his own name for $25, and afterwards sold the same for $200, and never accounted for the overplus and appropriated to his own use the rents of the property after June 8, 1902.

It is then alleged that Doctor Glascock's office, situated on lot one in Dexter, was insured and the premiums on this insurance were paid out of plaintiff Gillie's money, and that this office has since burned and that the defendant Melvin was about to collect the insurance. There is also a charge that the defendant Melvin has collected all the rents on lot one of the northwest quarter of section four and has never accounted for the same.

The answer of G. M. Glascock was a general denial.

Defendant Melvin admitted that he obtained the title to lot ten, block two, Deal & Boughton's addition to Dexter, and to lot number one of the northwest quarter of section 4, township 24, range 11, by the deeds set out in plaintiff's bill, and that on November 8, 1897, Dr. L. O. Glascock and plaintiff Gillie executed their joint promissory note to defendant for $725 and secured the same by their deed of trust on lots one, four and six and out-lot three, block 26, in Dexter. Further answering defendant Melvin stated that his dealings with the said L. O. and Gillie Glascock in and about the property mentioned in the bill

were all in the utmost good faith on the part of
the defendant and at the urgent request and solicita-
tion of said L. O. and Gillie Glascock, and defendant
paid the $800 mentioned in the two deeds of Novem-
ber 27, 1895, and also the $725 mentioned in the said
deed of trust of November 8, 1897, and that since the
execution of the deeds of November 27, 1895, L. O. and
Gillie Glascock have had possession of and collected
all the rents on said lot in Dexter under an
agreement that they would pay the taxes and keep
up the insurance, which they failed to pay, and de-
fendant was forced to pay the same, amounting to
$53.18, and there was the same agreement as to lot one
of the northwest quarter of section four, township
24, range 11, which they also failed to observe, where-
by defendant was compelled to pay $16.67 taxes on
said land.   Defendant also alleged that he had been
forced to pay all the taxes and insurance on lots one,
four and six and out-lot three in Dexter, since the
execution of the deed of trust of November 8, 1897,
in order to protect his lien thereon.

In relation to the property described as that west
of Bess Slough in the northwest corner of lot two
of the northwest corner of section 3, township 24, range
11, and known as Mill property, defendant alleged
that plaintiff Gillie and L. O. Glascock executed a deed
of trust thereon on December 29, 1899, to secure a
debt of $125 to A. H. Carter and J. N. Miller, that
this debt became due and said L. O. and Gillie were
unable to pay the same and at their request defend-
ant took an assignment of the same and paid said debt;
that afterwards Doctor Glascock was sent to an asylum
and it became necessary to foreclose this deed of trust
in order to get the title in a condition in which it
could be handled to the best interest of all concerned
and accordingly said property was advertised accord-

ing to the terms of the deed of trust and defendant Melvin became the purchaser of the same for $75 and afterwards sold the same for $200. And as showing his relation to the said Mill property he rendered the following:

Dr.

To amount sale of mill...........$200.00
To rent collected on property...... 26.00

Cr.

By note and deed of trust.......... $130.30
By taxes, cost of sale, repairs...... 74.31
By cash paid funeral expenses of Dr.
   Glascock ................. 131.80
By taxes and insurance on lot one.. 53.18
By taxes on eighty acres aforesaid.. 16.67
                             $226.00   $406.26

The defendant stated that he charged the last two items to this Mill account for the reason that they were justly due for moneys paid for and on behalf of plaintiff and her said husband and he has no lien or security therefor. Defendant Melvin further states that there is still due him on said property the sum of $180.26, and although he purchased the said property in open competition with the world, yet upon the payment to him of the said sum by plaintiff he will gladly reconvey said land to them or either of them.

In reply the plaintiffs denied all the new matter in the answer and alleged that the charges on the Mill property of $74.31, $53.18 and $16.67 are not proper charges on said property and were made for the purpose of burdening the same so as to prevent redemption by plaintiffs. They further state that the payment of Doctor Glascock's funeral expenses by defendant was wholly voluntary.

The cause was tried at the March term, 1905, of the circuit court of Stoddard county, and resulted in a decree for the plaintiffs by which the title to lots one, four and six in block 26 in the city of Dexter, was vested in plaintiff Gillie Glascock and the deed of conveyance made by her and her husband, Doctor Glascock, on the 8th of July, 1897, canceled, on the ground that said deed was procured by fraud by Dr. L. O. Glascock from his wife; and also canceling the deed of conveyance to said lot made by L. O. Glascock and Gillie Glascock to defendant G. M. Glascock on the 10th of December, 1900, and the deed to the same lots by G. M. Glascock to L. O. Glascock on the same day; and canceling the deed of trust given on said lots by L. O. Glascock and Gillie Glascock to the defendant Melvin Glascock on the 8th of November, 1897, on the ground that the said deed of trust was executed under the duress of Dr. L. O. Glascock of which duress the defendant Melvin had knowledge at the time. The court further found that the plaintiff Gillie A. Glascock was entitled to the insurance on the property which was located on one of said lots, which property had been destroyed by fire. The court further found that plaintiff Gillie was entitled to dower in lot three, block 26, in the city of Dexter, and in the Mill property. The court further found that Melvin Glascock had a mortgage lien on out-lot three in block 26 in Dexter subject to the dower interest of Gillie Glascock therein. The court further found that the defendant Melvin had the title to the two acres known as the Mill property subject to the dower interest of Gillie Glascock. The court then found that the defendant Melvin was the owner in fee of lot numbered 10 in block 2 in Deal & Boughton's addition to Dexter and also of lot numbered 1 on the northwest quarter of section 4 in township 24, range 11, in Stoddard county. The cost of the suit was adjudged against defendant and defendant Melvin was enjoined

from foreclosing his deed of trust on lots one, four and six of block 26 in the city of Dexter.' After unsuccessful motions for a new trial and in arrest of judgment the defendant appealed to this court.

To maintain the allegations of her petition the plaintiff Mrs. Glascock offered in evidence a warranty deed from herself to her husband L. O. Glascock dated July 8, 1897, conveying the lots one, four and six in block 26 in the city of Dexter for the alleged consideration of one dollar, and a deed dated December 13, 1900, by L. O. Glascock and herself to G. M. Glascock, conveying the same lots for an alleged consideration of one dollar. When offering this deed plaintiff called special attention to the acknowledgment of the deed, which was in these words:

"*State of Missouri, County of Stoddard, ss.*

"On this 13th day of December, 1900, before me personally appeared L. O. Glascock and Gillie A. Glascock, 'said she assigned that was enough,' his wife, to me known to be the persons described in and who executed the foregoing instrument and acknowledged that they executed the same as their free act and deed.

"In testimony whereof, I have hereunto set my hand and affixed my official seal, at my office in Essex, Missouri, the day and year first above written.

"My term of office, as a notary public, will expire October 9, 1901.    WILLIAM T. ARNOLD,

"Notary Public."

Plaintiff then offered in evidence a warranty deed of the same date from G. M. Glascock, a single man, to L. O. Glascock, conveying the same lots, which deed was recorded December 13, 1900.

In regard to the Mill property, Mrs. Glascock testified that Melvin Glascock paid off a mortgage on this property amounting to $130 and afterwards wrote from Tennessee that "when he came out here he would make it secure." But he never did anything

with it but left it an open account. After Doctor Glascock died both she and Melvin wanted the property sold and Melvin advertised it for sale telling her that he would buy it in and have it put in her name; that he bought it in his own name and told her that whenever they put up $200 in the bank she could give up the keys; that after that she was advised that the $200 was in the bank and she gave up the keys; that defendant got the full $200, and upon being asked by her what he did with it, he said he paid insurance with it. She further stated that she did not go to Bloomfield and bid on this Frisco property because she believed Melvin would buy it in for her.

In relation to the execution of the other deeds she testified in substance as follows: First, as to the deed of December 10, 1900, from herself and husband to G. M. Glascock conveying the lots one, four, six and three in Dexter, she stated that at first she would not sign it, but the doctor told her if she did not he would kill her and from his actions and looks she knew he would do so, so she signed it. She told G. M. Glascock what the doctor had done to get her to sign the deed. She never knew that there was a deed given with the consideration of one dollar and she never got the dollar. Upon the morning that this deed was made she, Melvin, G. M. and Doctor Glascock were at her home at Pinhook and went from there to Essex where she signed the deed. At the time she signed the deed G. M. and the doctor were standing in the door of the notary's office; Melvin was somewhere in town, but she did not know where. After the deed was signed the others went to Bloomfield to get the deed recorded and she returned to Pinhook. Second, in regard to the deed to the lots in Dexter known as the home place from herself and the doctor she testified in response to a question as to why that deed was executed, as follows: "The deed to the home place in Dexter was in my name and the doctor

told me that it being in my name, if we should both die, the place would go to all my folks, and I said it was not fair, we had no children at that time and he said for me to make this deed over to him in his name, and so I did, and I made the deed over to him in order that if we both died that way that it would not be all in one.''

Third, as to the deed of trust of November 8, 1897, on this home place for $725, she testified this was given without any consideration, she did not know anything about Melvin having the deed, they told her they were mortgages, she never knew there was any deed given except to G. M. Glascock, and they told her that was a mortgage. She signed this deed through fear of Doctor Glascock. He told her, ''If you do not sign that mortgage, I will kill you.'' And she told his brother this. ''The doctor looked wild out of his eyes and showed that his mind was not right.'' ''Q. Who was present at the time the doctor told you he would kill you if you did not sign your name to this deed of trust on the home place—nobody there besides you and him? Ans. No, sir, there wasn't— they would not let me know anything about their business—they kept it away from me for about eight weeks. Q. When did you tell the defendant here, Melvin Glascock, that you had signed this deed of trust under threats from your husband? Ans. At the time of the first deed I told him more than I did any-one else—I told him all about the doctor losing his mind, and how he talked to me, and I told him that at the garden gate, that he told me, if I didn't sign this mortgage—he never told me it was a deed—I told him that he said, if I didn't sign this, that he would kill me—and I signed them through fear, or I would not have signed them. Q. How long after you signed the deed until you told Melvin Glascock about your husband threatening you? Ans. I don't remember whether or not it was before or afterwards. Q.

It wasn't far from the time you had told him—about that or probably before that, that your husband wasn't in his right mind? Ans. Yes, sir, that I didn't think the doctor was in his right mind, that if he was, he would not have tried to get me to do anything like that, and I don't think the doctor had his right mind— I know there was times, even when he bought that mill, that he didn't have his right mind. Q. What did Melvin Glascock say, when you told him about signing that deed? Ans. He said, 'Oh, Gillie, surely not,' and I says, 'Teeney, I believe he is going crazy— his eyes fairly sparkled.' Q. What did he say? Ans. He said, 'surely not.' "

On cross-examination, she testified to the following effect:

She lived with Doctor Glascock as his wife, from 1866 to the time he was taken away. Melvin Glascock visited their home frequently, was always agreeable in his conduct and always showed a disposition to see her and the doctor get along in the world. At the time the doctor was taken away to the asylum, she was living with him at Pinhook. Melvin Glascock came over, but she did not remember of sending for him. She was not afraid of the doctor at the time he was taken away, so long as she could keep him in a good humor, but was afraid of him when he was angry. If she ever told her neighbors that she was not afraid of him and that there was no need of sending him away, she didn't remember it. She testified that at this time, 1901, she had all the confidence in the world in Melvin Glascock, and that she always thought that he would befriend her and did not think that he would take a penny in the world away from her under any circumstances. She continued to have this same regard for him until he took the Pinhook place away from her. The doctor told her if she did not sign the mortgage he would kill her. He told her that when she signed the first one. When she

signed the deed at Essex, he had already told her that if she didn't sign these mortgages, he would kill her. He told her that morning to get herself ready to go to Essex to sign this deed, and she knew she had to do it.    Being asked if the doctor ever told her more than once that if she didn't sign the deed, he would kill her, she answered that he told her that if she didn't sign the mortgage on the home place at Dexter, he would kill her.    She further stated that he didn't come right out and tell her that she had to sign the deed at Essex (with the peculiar acknowledgment) but he told her to get herself ready to go to Essex and sign that deed and she did.    The deed from herself to L. O. Glascock dated July 8, 1897, conveying the lots one, four and six in Dexter, she signed voluntarily because "if he died, it would come back to me." That was "way back yonder."    "Q. The morning before you went to Essex to sign the deed, did he tell you that morning that he would kill you, if you didn't · sign the deed? Ans.    He did not come right out and tell me, but he told me to get ready to go to Essex and sign that deed and I did.    .    .    . Q.    Now, Mrs. Glascock, you stated that you made a deed to L. O. Glascock before you made those other deeds, he did not threaten to kill you to make you do that did he?    Ans.    No, sir, that was away back yonder, when the deed was made.    Q.    And you voluntarily made that deed?    Ans.    Yes, sir, because, if he died, it would have to come back to me.    Q.    There were no threats made to make you make that deed? Ans. No, sir."    She testified further that she never signed a deed to the eighty acres.    They told her it was a mortgage, though she did not know that Melvin ever told her it was a mortgage.    She did not know whether her husband went to Tennessee to borrow money or get Melvin to buy the land.    She signed the deed of trust for $725 because she had to.    She was afraid of the doctor.    Every paper she signed was

because she was afraid not to sign. Melvin never told her he would kill her and never intimidated her in any way to get her to sign it and if he was present she did not know it. She never wrote him to let her have money on the home place or she would lose it. She could not say whether defendant Melvin let the doctor have money from time to time because she never saw it or saw him get it. She had no recollection of giving a deed of trust on the home place to Thomas Ulen. The doctor did not threaten her to get her to sign the Ulen deed of trust. She testified that she and her husband kept possession of the eighty acres until the doctor's death. They had the use of it after the doctor's death, defendant Melvin got the rents, she and her husband also had possession and got the rents from the home place in Dexter. Sometimes the doctor paid the taxes and sometimes Melvin.

The notary testified that when the deed was made by Doctor and Mrs. Glascock to G. M. Glascock, the doctor and G. M. were up at the door or had just stepped out. He asked her if she understood the nature of the deed. She signed it. She would not say whether she signed it as her own free act and deed. She simply said she had signed it and that was sufficient.

Mr. Langford testified he knew Doctor Glascock for ten years and worked for him. Never noticed anything wrong with him until about one year before he was taken to the asylum. The doctor had transacted all his business right up to the time he was sent to the asylum.

Mrs. Mentz testified that she thought the doctor acted strangely about eight years before the trial.

On the part of the defendants there were eight witnesses who were well acquainted with the doctor up to the time he was sent to the asylum and there was nothing wrong with his mind up to about one year before he was sent away. He attended to all of his

affairs. The evidence on the part of the defendants tended to fully sustain the answer of the defendant Melvin Glascock, and other facts will be noted in the course of the opinion.

The case can only be disposed of intelligently by a consideration of the charges separately and the decree of the court as to the separate tracts of land.

I. The circuit court decreed a cancellation of the deed executed by the plaintiff Gillie to her husband Dr. Glascock, of lots one, four and six, in block 26, in Dexter, of date of July 8, 1897, on the ground that it was obtained by fraud on the part of Doctor Glascock, and also canceled the two deeds, made to confirm that deed, on December 10, 1900. This was the home place in Dexter. The averment as to the procuring of this deed of July 8, 1897, is that it was obtained "by the same means of duress for one dollar, which was never paid." The only testimony as to the procurement of this deed was given by the plaintiff. She testified, "The deed to the home place in Dexter was in my name, and the doctor told me that, it being in my name, if we both should die, the place would all go to my folks and I said it was not fair. We had no children at that time, and he said for me to make this over to him in his name and so I did and I made the deed over to him in order that if we both died that way, it would not be all in one." She testified that she made the deed voluntarily and without any duress whatever. There is no charge of fraud in the obtaining of this deed by Doctor Glascock, and plaintiff's own testimony negatives the charge of duress and every semblance of fraud as to this deed. The conveyance was regular on its face and there is not a scintilla of evidence that the defendant Melvin Glascock had any notice of duress or fraud in procuring the same. That plaintiff, Mrs. Glascock, was legally competent to convey this realty to her husband with-

out the intervention of a third party was established
by this court In Banc in Rice, Stix & Co. v. Sally, 176
Mo. 107, and followed in Grimes v. Reynolds, 184 Mo.
l. c. 692, and 184 Mo. 694; O'Day v. Meadows, 194 Mo.
l. c. 614; Bower v. Daniel, 198 Mo. l. c. 320; Rice, Stix
& Co. v. Sally, 198 Mo. l. c. 687; Rossier v. Railroad,
115 Mo. App. l. c. 520.

II. In natural and logical sequence this brings
us to the decree of the court also canceling the two
deeds of December 10, 1900, whereby Doctor Glascock
and plaintiff Gillie conveyed the title to this home
place first to G. M. Glascock, his brother, and by the
latter back to Doctor Glascock. Obviously these con-
veyances were conceived and executed by Doctor Glas-
cock on account of the opinion theretofore held by many
members of the bar and by both courts of appeals,
that the conveyance of July, 1897, did not have the
effect of vesting the legal title in Doctor Glascock to
this real estate and it was sought to cure this sup-
posed defect by reconveying the property to G. M.
Glascock and have him convey to Doctor Glascock.
The circuit court found that the conveyance by Doctor
and Mrs. Glascock was invalid, but does not state in
its decree upon what ground it based its decree. The
ground alleged in the petition is that this deed was pro-
cured by violent and furious threats and by duress.
The testimony of Mrs. Glascock alone sustains this
charge. She testified in chief that the doctor told her
if she did not sign the deed, he would kill her, but in
her cross-examination she stated: "He did not come
right out and tell me but he told me to get myself
ready to go to Essex and sign that deed, and I did."
There is evidence of the notary that when he pro-
pounded the usual questions as to executing the same
voluntarily, she said she had signed it and that was
sufficient. But Melvin Glascock did not know of any
duress, if such there was, and whether there was or

not, those transactions, if invalid, left the title in Doctor Glascock just as it was, under the deed of July 8, 1897, with an inchoate right of dower in plaintiff, Gillie. In so far as the decree might affect the rights of Melvin Glascock, we think it was not supported by the evidence of plaintiff herself, independent of the testimony on the part of the defendants which positively denies all knowledge of insanity on the part of Glascock and of any threats or duress or involuntary execution of the deed.

III. But even if we are wrong in our construction of the evidence as to the deeds of December 10, 1900, it is obvious they cannot affect defendant Melvin's security obtained by the deed of trust of November 8, 1897, executed three years before the deeds of December 10, 1900. As already stated, the deed of July 8, 1897, had vested the title to the home place, lots one, four and six in block 26 in Dexter, in Dr. Glascock, by the wholly voluntary act of plaintiff Gillie. This deed of trust was given to secure a note of $725 signed by both Dr. and Mrs. Gillie Glascock, payable two years after date and bearing six per cent interest. The circuit court found this deed of trust was procured by duress of Doctor Glascock, of which defendant Melvin had knowledge at the time. That defendant Melvin loaned Doctor Glascock the $725 at the date of the note and deed of trust is evidenced by the genuine signatures of Dr. and Mrs. Glascock and the possession of the note and deed of trust by Melvin at the time of the trial. By positive statute in this State this note imported that Melvin Glascock had furnished the consideration therein named and the burden was on plaintiff to show lack thereof. [R. S. 1899, secs. 457 and 894; County of Montgomery v. Auchley, 92 Mo. l. c. 129; Taylor v. Newman, 77 Mo. 257.] But Mrs. Glascock simply testified she did not know anything about it. She could not say whether

the doctor got the money or not. But the matter was not left to presumption or doubt by defendant's testimony. He testified that in the fall of 1897 his brother wrote him that he was involved and desired defendant to come over to Missouri and let him have some money, if he could; and Mrs. Glascock wrote in the letter that the ownership of the three lots was in her name, and for defendant to come and she would give the mortgage; that the lots would be sold unless she could get some help; that thereupon he came to Missouri and the doctor and Mrs. Glascock summed up their debts and at first thought $700 would cover all the debts, but found out that would not be enough, and defendant told them to make it $725 and they said that would be ample, and thereupon he let them have the $725 and took their note and this deed of trust. Moreover Melvin's testimony is strongly corroborated by the fact that Ulen had a mortgage on these lots and that was paid off about this time, although Mrs. Glascock also testified she knew nothing of the Ulen mortgage. The testimony of Mozley and G. M. Glascock and Jeffers sustained defendant as to the furnishing of this money. Over and against this array of evidence we have merely the general statement of Mrs. Glascock that all the deeds were executed under duress.

While this court is inclined to defer to the finding of the circuit court, it has never abdicated its right to review the findings of the circuit court in chancery cases. [Kinney v. Murray, 170 Mo. 1. c. 707; State ex rel. v. Jarrott, 183 Mo. 1. c. 219.] Bearing in mind that this is a bill to cancel a solemn written instrument on the ground of duress, and that courts of equity require clear, cogent and convincing evidence in such cases, we are unable to concur in the finding of the circuit court that this note and deed of trust were obtained by duress. The plaintiff's evidence is entirely too meager and unsupported to justify

such a decree, whereas that of defendant showed that Melvin not only furnished the money and that the deed of trust was freely executed by plaintiff, but that it was the result, in part, of her own request, and was an act on the part of Melvin prompted by brotherly affection, and the whole transaction consists with the utmost good faith and fair and liberal dealing, and at a time when plaintiff's own evidence shows the doctor was entirely sane.

IV.   Having reached this conclusion as to the deed of trust, it must needs be held that so much of the decree as awards plaintiff Gillie the insurance money arising out of the destruction of the property on one of the lots could not be upheld even if there had been proof that a building had been destroyed by fire, which there is not in this record. ·

V.   The court decreed dower in the Mill property, bought by Melvin, the defendant, under foreclosure of the deed of trust given by Doctor Glascock and plaintiff Gillie to secure Miller and Carter for $125. There is no claim that this deed of trust was invalid in any degree, but plaintiff insisted that Melvin agreed to buy it for her.   The decree is illogical.

If Mrs. Glascock was entitled to anything under her petition as to this property it was a right to redeem the whole title by paying defendant Melvin his outlay in acquiring the title at the trustee's sale, but the court evidently did not so find, but simply decreed her dower in the Mill property of two acres. The deed of trust being entirely valid, and defendant having bought the note to protect Dr. and Mrs. Glascock, no doubt can exist of his right to buy the property at the trustee's sale, especially as this was plaintiff's desire.   Moreover, defendant waived all questions of this kind by offering to let her redeem upon paying his charges thereon, and this was all that the

court could have decreed. We think the court erred in decreeing dower in this land to plaintiff Gillie.

The circuit court found for defendant, Melvin, as to lot ten in block two in Deal & Boughton's addition to Dexter, and as to the eighty acres in lot number 1, section 4, township 24, range 11 in Stoddard county, and we think rightly.

We have carefully read the whole of this record and have conceded the advantage which the circuit court had in seeing and hearing the testimony, but weighing the plaintiff's own testimony it falls far short of that cogent and satisfactory evidence which a court of equity requires to set aside and cancel solemn written instruments and conveyances and certainly fails to show any of the collusion and fraud alleged against the defendant Melvin Glascock to strike down and destroy his securities for loans made by him to aid and assist his brother.

The decree of the circuit court is reversed with directions to dismiss the bill. *Burgess* and *Fox, JJ.,* concur.