MARIE W. COLEMAN and PAUL COLEMAN, her husband, Appellants, v. CRESCENT INSULATED WIRE & CABLE COMPANY, a New Jersey corporation; TITLE GUARANTY TRUST COMPANY OF ST. LOUIS, a Missouri corporation, Trustee for FREDERICK J. W. STUECK in a certain deed of trust, dated April 24, 1930, executed by plaintiffs as parties of the first part; TITLE GUARANTY TRUST COMPANY, as party of the second part and FREDERICK J. W. STUECK as party of the third part, recorded in the Recorder of Deeds' office in Barry County, Missouri, in Book 86, page 404; and FREDERICK J. W. STUECK, Respondents.—No. 38021.—168 S. W. (2d) 1060.

Division One, February 2, 1943.

Rehearing Denied, March 2, 1943.

*James T. Blair, Jr.,* and *Taylor R. Young* for appellants.

*Charles E. Ginn* for respondents.

784

VAN OSDOL, C.—This is a suit to set aside and cancel a deed of trust on real estate and the notes secured by it, and for an accounting. The suit was filed on February 2, 1940, and the trial of the case was concluded on June 27, 1941, resulting in a finding for the defendants and a dismissal of the plaintiffs' bill.

A rehearing has been granted herein and the cause is now reassigned.

The petition alleges that the notes were without consideration; that the execution of the notes and deed of trust, and the payment of certain moneys, was under duress; and that the payee of the notes is a trustee ex maleficio and, because of this, it is alleged, the notes are void. The answer is a general denial, pleas of statute of limitation and laches.

Respondents, defendants below, have moved to dismiss the appeal because the appellants' brief, they allege, violates Rule 15 of this court. We have compared appellants' brief with the abstract of the record. We think the brief is not sufficiently argumentative and incomplete to violate the rule and, we believe, that counsel for appellants have not purposely misstated the facts to mislead us. The motion is accordingly overruled.

It is necessary to review the facts.

The appellants, plaintiffs below, Paul and Marie W. Coleman, are husband and wife and, at the time of the trial, resided in St. Louis, Missouri. They have one daughter who, in the year 1930, was eighteen years of age and a school girl. Marie W. Coleman is the owner of a one-sixth interest in the lands described in the deed of trust, having acquired such interest as devisee under the will of her father, Patrick Martin, who, in his lifetime, was a respected citizen of Barry County, Missouri.

Paul Coleman was, from sometime in 1927 to January 20, 1930, the consignment sales agent at St. Louis, Missouri, of the respondent, Crescent Insulated Wire and Cable Company ( hereinafter called Cable Company) whose principal office is in Trenton, New Jersey. Cable Company manufactures and sells heavy insulated copper wire and cable and, at St. Louis, Paul Coleman was consigned carload lots of wire which he received and stored in a warehouse he had rented in his own name. Orders were received at the home office of Cable Company, an invoice was then sent to the customer, a copy was retained at the home office, and another sent to Coleman, who then delivered the wire listed in the invoice to the customer, taking a customer's receipt. Coleman also sold wire directly to the customer and, when he did so, made a "charged ticket" in triplicate, one of which copies was sent to the home office of Cable Company. All moneys in payment for goods sold either by the home office or by Coleman were paid into the home office of Cable Company in New Jersey.

The consignment stock of wire in Coleman's warehouse was checked four times yearly by Cable Company's auditor, L. K. Schauer. Mr. Schauer would check and inventory the stock and forward a report

of his audit to the home office, where a comparison would be made with the records there kept of Coleman's consignment account.

On January 20, 1930, Mr. Schauer completed an inventory of the stock and made a report of the result to Cable Company. The report, when compared with Coleman's consignment account at the home office, showed a shortage of wire of the value of $8155.14. Cable Company thereupon immediately got in communication with Schauer by telephone, directing him to engage an attorney.

The late William Baer, Esq., of St. Louis, Missouri, was employed by Schauer to act for Cable Company in the matter of the alleged shortage. Much of the practice of Mr. Baer was in the criminal courts. At least in part, through his efforts, appellants, on April 22, 1930, signed installment notes aggregating $6,155.14, executed a deed of trust to secure the notes on the real property of appellant, Marie W. Coleman, to the respondent, Title Guaranty Trust Company of St. Louis, trustee, for the respondent, Frederick J. W. Stueck, beneficiary; Mrs. Coleman, also, paid the sum of $2000 to Mr. Baer by check. The first installment note became due on the 21st day of October, 1930, and the balance of the installment notes were due successively at ninety day intervals. The first two installment notes of $225 each were paid, on or about due dates, to Mr. Baer, the payments in part by check of Mrs. Coleman. No further payments have been made.

An action to partition the lands described in the deed of trust was brought in the Circuit Court of Barry County, on February 3, 1939. Mrs. Coleman was a party plaintiff in the partition case. On the 29th day of April, 1939, an amended petition in the cause was filed. In each of these pleadings the lien of the deed of trust was recited, but with no allegation of duress. On April 13, 1940, a second amended petition was filed in which the invalidity of the notes and deed of trust was first alleged. The evidence is not clear that Mrs. Coleman knew of the allegations of the pleadings relative to the lien.

There is little conflict in the evidence of the facts thus far related, but the testimony directly bearing on the issue of duress is in very sharp conflict indeed.

It was the testimony of appellant, Coleman, that he knew nothing of a shortage until he was told of it by Schauer, eight or ten days after inventory, at which time Schauer said he "had instructions to place the case with the Circuit Attorney and have a warrant or ask for a warrant of prosecution"; that he talked to his wife immediately upon being told of the shortage; that Schauer, thereafter, told him daily for several days that he "had been to the Circuit Attorney to ask to have a warrant issued and have me arrested." That he, Coleman, made a visit to the home office of Cable Company and was told by J. Cornell Murray, treasurer of Cable Company, that "William Baer had instructions to prosecute the case as a criminal case," and "that the amount must be paid in full or the case would be prosecuted"; that Edwin Murray, president of Cable Company,

said that he "wasn't interested in the collection of money—he wanted to make an act of prosecution"; that A. A. Newman, sales manager of Cable Company, told him that "an employee had been employed by J. Cornell Murray and the collection of accounts was in J. Cornell Murray's hands"; that later, upon his return to St. Louis, Schauer said to him that it "would be a shame to bring disgrace on my wife and daughter"; that they, appellants, consulted an attorney, Mr. George E. Heneghan, who advised them not to settle with Cable Company; and that he and his wife later visited the offices of Mr. Baer who told him, in the presence of Mrs. Coleman, that he "had instructions to obtain every cent of the account or criminal prosecution." In connection with the cross-examination of Coleman a letter written by him to Cable Company, on January ▮▮▮ 23, 1930, was received in evidence; parts of the letter read as follows:

"In regard to settlement of shortage of stock as of the close of business January 20th, 1930.

"Mr. Schauer is sending sales report with the close of business January 20th together with his other records. . . .

"I will cooperate with Mr. Schauer in every way in obtaining the accuracy of the condition and there are no secrets.

"I will discuss all of these conditions with my immediate family and obtain as much cash as possible for immediate remittance and make guarantee on the difference.

"I suggest that you withhold any criminal action at once as to do this would *impare* my ability to obtain any cash assistance. . . .

"For you to take immediate action would place me in a position of not being able to receive any assistance, at the same time would destroy my home from whom I expect assistance.

"Should you take immediate criminal action I would be unable to receive any financial assistance and the amount involved would be a total loss to you financially. . . ."

It was the testimony of Mrs. Coleman that her husband did not request her to pay or secure the alleged shortage; that Schauer talked with her by telephone, in this conversation "Mr. Schauer told me that unless I would give the two thousand dollars and sign the notes for the balance, secured by mortgage, that he was going to have my husband arrested for prosecution and sent to the penitentiary; that he had instructions from his company to do that; of this shortage." Further, that she and her husband visited the office of Mr. Baer who told them "unless Mr. Coleman paid in full—that he had instructions from the Crescent Company to have him arrested for embezzlement and sent to the penitentiary"; that Mr. Heneghan had theretofore advised her not to make a settlement; that she was weak and ill from the effects of influenza at the time, and that the reason she signed the notes was, "I was threatened or I never would have signed them, because I thought too much of my poor father's memory to sign his property that had never had a mortgage on it" and "Well, and for my

family, I respected my family, and the Martin family is known in Barry County as one of the most highly respected families, and for my daughter's sake, she was in school and I wanted to save her that disgrace, and also to preserve the Martin name that had never had a blemish on it; that is why I did it, and I never would have done it only I was threatened.''

In connection with the cross-examination of Mrs. Coleman it was shown that the deposition of Mrs. Coleman was taken prior to trial by a stenographer who, counsel for appellants stated, ''is one of the best in the United States.'' When transcribed the deposition was given to Mrs. Coleman for examination; after retaining the deposition for ''quite a few days'' she then corrected her answers to eleven questions, all of which corrections had material bearing on the issue of duress; an example, to the question ''Did Mr. Baer ever directly threaten you with any prosecution of your husband?'' the answer in the typewritten transcript was ''No, through my attorney.'' But the answer to the question as corrected by Mrs. Coleman reads, ''Yes. He said he would send my husband to the pen unless the shortage was paid in full. He also told my attorney the same thing.'' And again, to the question ''Who first approached you on the proposition of signing the notes on the real estate in Barry County?'' the answer as transcribed in typewriting was ''Well, I imagine it was Mr. Heneghan'' and the answer as corrected by Mrs. Coleman—''Well, I imagine it was Mr. Heneghan, Mr. Baer and Mr. Schauer.''

It was the testimony of Schauer that, upon his arrival at Coleman's warehouse to make the inventory in January, 1930, Coleman told him that there would be a big shortage, that Coleman was ''red in the face and made a threat that he was going to jump off a bridge and end all, he did not want to disgrace his family.'' It was further the testimony of Schauer that a shortage of around $8000 was discovered, that he gave a copy of the inventory showing the shortage to Coleman, who acknowledged that it was correct by signing the copy retained by Schauer. Schauer denied that he had ever threatened Coleman with arrest or prosecution, that he had ever threatened Mrs. Coleman with the arrest or prosecution of her husband, that he had ever instructed Baer so to do, or that Baer had ever threatened either or both of appellants in his, Schauer's, presence.

William Baer and A. A. Newman had died prior to trial. It was the testimony of Schauer that Edwin Murray, being of advanced age, had suffered loss of memory.

 First we should consider the statute of limitations as it is applicable to the prayer for the cancellation of the notes and deed of trust.

The respondents seek to invoke the five-year statute of limitation, Section 1014, R. S. 1939, citing Ludwig v. Scott (Mo.), 65 S. W. 2d 1034, which was a suit for cancellation of instruments, including notes and a deed of trust, on the ground of fraud.

But appellants do not allege fraud in their petition; they state for their cause of action that the execution of the instruments was induced by duress and that there was no consideration. While duress has been said to be a species of fraud, yet there is a clear distinction between them. In fraud the party defrauded acts willingly because of the false representation made to him by the defrauding party, the falsity of the representation not being known by the party defrauded; in duress the victim acts knowingly but unwillingly because of the coercion exercised upon him. In the case of duress there is an element of force, or threatened force, wholly lacking in fraud. Security Savings Bank v. Kellems (Mo. App.), 274 S. W. 112, affirmed after transfer to Supreme Court in 321 Mo. 1, 9 S. W. 2d 967. Having in mind the distinction between fraud and duress, there is, we believe, a reason that duress has not been set out in Section 1014 as being within the purview of the section—the victim of duress may continue for a time, after his cause of action has accrued, to be submissive to the force or threatened force which had theretofore caused him to act, whereas a defrauded person has, upon the discovery of the fraud, no such deterrent.

Appellants assert that their case is one to recover real property and rely on the provisions of Section 1002, R. S. 1939, as providing the limitation period applicable. They cite as authority for their position the cases of Branner v. Klaber, 330 Mo. 306, 49 S. W. 2d 169, and Parish v. Casner et al. (Mo.), 282 S. W. 392, both of which are suits to set aside deeds and (in the Parish case by alternative pleading) to recover the lands conveyed.

This court has held that Section 1002 applies to suits for the cancellation of conveyances by which title to land has been conveyed, even though the ground for the cause of action is fraud (Branner v. Klaber, supra, and Kober v. Kober, 324 Mo. 379, 23 S. W. 2d 149), for the relief sought in such cases looks to the recovery of real estate or the possession thereof. Kober v. Kober, supra. But, it is settled in Missouri that a grantor in a deed of trust does not convey the title to the trustee, but creates a lien on the land to secure the payment of debt, and that the grantor continues the owner of the land until entry for breach of the condition of the deed of trust. Lustenberger v. Sarkesian, 343 Mo. 51, 119 S. W. 2d 921; Reynolds v. Stepanek, 339 Mo. 804, 99 S. W. 2d 65; Benton Land Co. v. Zeitler, 182 Mo. 251, 81 S. W. 193.

The court in Ludwig v. Scott, supra, helps clarify the question of limitation, now under consideration, by the statement (65 S. W. 2d at page 1035) that Section 1014, R. S. 1939, "applies to all actions for relief on the ground of fraud except where the object of the suit is to recover real estate. (Citing Branner v. Klaber, supra, and cases cited therein.) Actions for cancellation or reformation of instruments on other grounds than fraud may come within the third subdivision of the ten-year statute, Section 861, R. S. 1929, (now Section 1013,

R. S. 1939).'' Citing Hoester v. Sammelmann, 101 Mo. 619, 14 S. W. 728, a suit to reform a deed of trust because of mistake; Stark v. Zehnder, 204 Mo. 442, 102 S. W. 992, a suit to reform a contract of lien on land because of mistake; White v. Pendry, 25 Mo. App. 542, a suit to cancel a note and mortgage on land and chattels for failure of consideration; and Lile v. Kincaid, 160 Mo. App. 297, 142 S. W. 434, a suit to cancel an order of a probate court because of inadvertence.

Since relief is not sought in this case on the ground of fraud, and since this is not an action to recover real property or the possession thereof, we believe that the limitation period provided in Section 1013 applies in this case; and, as this suit was instituted within ten years from the making of the notes and the execution of the deed of trust, the appellants' cause of action for the cancellation of the notes and deed of trust is not barred by the statute of limitations.

However, the relief sought by appellants by way of an accounting to recover the $2000 and the two interest payments alleged to have been paid under duress, sounding as it does of an implied promise to pay, must fail because of the limitation period as provided in Section 1014, R. S. 1939.

It is alleged by appellants that the respondent, Stueck, to whom the notes were made payable, held the notes and deed of trust as a trustee *ex maleficio*; for, it is stated, Cable Company, a foreign corporation, although required by law so to do, has not procured license to transact business in this state, and that Cable Company, ''took title to the notes'' in the name of Stueck, to evade the law. The appellants did not introduce any testimony in support of this allegation.

Respondents urge that appellants have been guilty of laches in not filing their case for nearly ten years after the making and the execution of the notes and deed of trust. While laches is a defense peculiar to courts of equity, it is not generally invoked within a period of time less than the period by which the cause of action is barred by limitation, unless it appears that the opposing party, because of the delay, created a situation which caused the proponent of the plea to change his legal position. White v. Pendry, supra. Here, respondents knew the facts equally with appellants, and no change of position on the part of respondents is shown.

Appellants specifically assign error, in the motion for a new trial and herein, in the exclusion of evidence offered in connection with the testimony of the appellant, Coleman: ''that the warehouse was broken into as shown by the report of the night watchman on August 27, 1929, and again on the 9th of November, 1929, by the same night watchman, and what was taken out of there at that time the witness does not know.'' As a reason for an objection to this proffer, counsel for respondents stated ''the report of the night watchman

would be hearsay.'' The trial court ruled correctly in sustaining this objection. White v. Hasbaugh (Mo. App.), 124 S. W. (2d) 560.

■ Appellants assign error in excluding evidence offered in connection with the testimony of George E. Heneghan: ''That Mr. Baer told the witness that unless Mr. Coleman made a settlement in cash and secured the balance that he would send him to the penitentiary.'' It is noted that the exclusion of this proffer was not specifically stated as error in the motion for a new trial, nor was there a general statement of error in the exclusion of evidence in the motion. In order to preserve the exception the attention of the trial court should have been directed to it by a specific or a general statement of error in the exclusion of evidence in the motion for a new trial. Sterrett v. Met. Street Ry. Co., 225 Mo. 99, 123 S. W. 877.

■ The appellants have alleged want of consideration in the making of the notes. Considered apart from the issue of duress, the appellants, having executed the notes, and having alleged want of consideration as a ground for the cancellation of them, the burden of proving the allegation is on the appellants. Glascock v. Glascock, 217 Mo. 362, 117 S. W. 67; Plumbly v. Harvard State Bank, 133 Neb. 630, 276 N. W. 385; 12 C. J. S., Cancellation of Instruments, sec. 69. In this the appellants have failed.

■ As to the issue of duress: it is sufficient to constitute duress, which will avoid a contract, or other instrument, that one party thereto is prevented from exercising his free will by reason of threats made by the other, and that the contract is obtained by reason of such fact. The test is the state of mind induced by the threats made. The character of the threats is not so material, it being sufficient to constitute legal duress, if they deprive the party purporting to be obligated of his free moral agency. Miss. Valley Trust Company v. Begley, 298 Mo. 684, 252 S. W. 76. According to the modern doctrine, with which our courts are in harmony, the question of duress is one of fact in the particular case. The question is: was the person so acted upon by threats by the person claiming the benefit of the contract, for the purpose of obtaining the contract, as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained. So duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The ultimate fact in issue is whether the alleged injured party was bereft of the free exercise of his will power; and of which, the means used to produce such state of mind, the age, sex, capacity, situation, and relation of the parties, are all evidentiary. Miss. Valley Trust Company v. Begley, supra, and authorities ■ therein cited; 17 Am. Jur., Duress and Undue Influence, sec. 11; and 17 C. J. S., Contracts, sec. 175.

■ Duress exists when a person is by threats of criminal prosecution deprived of his own free will and agency and thereby induced

to make a contract or perform some act that he would not otherwise have made or performed. Hensinger v. Dyer, 147 Mo. 219, 48 S. W. 912. Nor must the threats be of an unlawful prosecution, Sumner v. Summers, 54 Mo. 340, Hensinger v. Dyer, supra. A wife may avoid an obligation which she has been induced to undertake by threats of a criminal prosecution of her husband. Hensinger v. Dyer, supra.

On the issue of duress in this case, then, the question is: did Cable Company, through one or more of its officers and agents, by threats of prosecution for embezzlement, with the purpose of obtaining the execution of the instruments, cause such a state of mind in appellants that they were bereft of their own free will or agency, and was the execution of the notes and deed of trust thereby obtained?

If the testimony of Schauer is believed, then the trier of the fact may well find that the appellants were not threatened, or that the inducing cause of the execution of the instruments was not threats, but was the consciousness in the mind of appellants of the probable prosecution of Coleman for embezzlement and a resultant desire to forestall it. The language of the letter of Coleman to Cable Company would seem to bear out such a consciousness and such a desire on the part of Coleman.

If the trier of the fact believes the testimony of appellants, then it may properly be found that they were almost constantly harassed by threats of the prosecution of Coleman from the time of the discovery of the alleged shortage until the execution of the instruments, that such threats deprived them of the exercise of their independent will and so induced the execution of the notes and deed of trust.

Touching the credibility of the appellant, Coleman, there must be considered the letter from Coleman to Newman; and, of the appellant, Mrs. Coleman, the inferences which may be drawn because of the corrections made in the answers in her deposition; these changes of answers, it may be said, seem to show a willingness on the part of Mrs. Coleman to shade her testimony to strengthen her cause. And, it is urged by appellants that, while William Baer and A. A. Newman are dead, and Edwin Murray is, apparently, incompetent, there is no explanation of the failure of respondents to offer the testimony of J. Cornell Murray either by person or by deposition. The court is justified in considering the presumption which may attend such failure. Nor is there an explanation shown of the failure of the respondents to offer letters, or copies of letters, between Cable Company and Baer and Schauer, as well as other documents pertaining to the case, which it may be assumed, absent explanation, are in the files of Cable Company notwithstanding the lapse of time.

A true finding on the merits of this case depends largely on the judging of the credibility of the witnesses, and a weighing of such presumptions as might attend omissions to produce evidence as the same may be considered with reference to a determination of the credit of the witnesses.

A court of equity in a trial de novo, as here, passes on the weight of the testimony; however, where there is a conflict in the parol testimony, as here, and the credibility of the witnesses is involved, as here, the court generally defers to the finding of the trial court, unless satisfied that the finding is against the weight of the evidence. Hein v. Payne, 346 Mo. 967, 144 S. W. 2d 122; Manahan v. Manahan (Mo.), 52 S. W. 2d 825; Reaves v. Pierce (Mo.), 26 S. W. 2d 611.

We cannot say that the finding of the trial court was against the weight of the evidence in this case, and are, therefore, constrained to defer to the judgment of the chancellor, who, having seen the witnesses on the witness stand and observed their demeanor, was thereby better enabled to judge their credibility and so to arrive at a correct finding in the cause.

The judgment is affirmed. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.