Emory C. NICHOLS, Appellant,

v.

Wayne WIRTS and Edith May Nichols,
Respondents.

No. 44029.

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1954.

W. Don Kennedy, Nevada, for appellant.

C. Myrl McGlothlin, Nevada, for respondents.

HOLLINGSWORTH, Judge.

By this action plaintiff, Emory C. Nichols, seeks to set aside two deeds and a bill of sale conveying to defendant Edith May Nichols his interest in an eighty acre tract of real estate in Vernon County, Missouri, and certain personal property situate thereon, then owned by plaintiff and defendant Edith May Nichols as husband and wife in a tenancy by the entirety, upon the ground said instruments were obtained by duress. The duress alleged is that defendant Edith May Nichols threatened plaintiff with criminal prosecution for forgery of her name as a comaker with plaintiff on two promissory notes given by plaintiff to the Barton County State Bank at Lamar, Missouri. Wayne Wirts is joined as a party defendant solely because he acted as a conduit in effecting the transfer of title to the real estate.

The trial court found the issues in favor of defendants and so rendered its decree,

from which plaintiff appealed, contending that the finding and decree is against the weight of the evidence. Unless otherwise specified, Edith May Nichols hereinafter will be referred to as though she were the sole defendant.

Prior to and at the time of their marriage in September, 1947, plaintiff and defendant resided in Pittsburg, Kansas. Both were employed and defendant continued her employment for nine or ten months after their marriage. They purchased for the sum of $1,800 and took title by the entirety to a home in Pittsburg in February, 1948. Defendant paid most of the purchase price. That home was sold.

In August, 1949, plaintiff and defendant purchased the farm here in question for the sum of $2,400. Title was vested in them in an estate by the entirety. As a part of the purchase agreement, they placed $1,000 in escrow pledged for use in improvements on the farm. The purchase price of $2,400 was borrowed under a repayment plan whereby the loan was to be liquidated by monthly remittances of $93.75, which plaintiff expected to receive under the Vocational Agriculture Training Program. Shortly after moving to the farm in September, 1949, they bought three cows, a calf and three brood sows. The $1,000 placed in escrow and other money spent in equipping the farm came mostly from the sale of the home in Pittsburg, Kansas. They lived together upon the farm and operated it through their joint efforts. In February, 1950, the first payment of $270 was made on the loan by a check drawn on the joint checking account in the Pittsburg Bank. Plaintiff became finally enrolled in the Vocational Program in April of 1950. Continuously thereafter through February, 1952, all of the checks, except two, received by plaintiff under that program were paid on the loan, a total of about $2,000.

In March, 1951, plaintiff arranged for a loan of $130 from the Barton County State Bank. A note was prepared at the bank for that amount and given to plaintiff for the purpose of procuring defendant's signature thereto. Several days thereafter plaintiff signed his and defendant's names on the note as comakers and mailed it to the bank. In September, 1951, plaintiff renewed the note and again signed defendant's name as a comaker. In October, 1951, defendant filed a suit for divorce.

Plaintiff testified: He and defendant had domestic troubles "off and on right along but it began to get bad * * * about September, 1951." He several times told defendant if she would give him the amount of the Government checks he had paid on the farm, that was all he wanted. On the day he renewed the note at the bank in September, 1951, defendant asked him, "Who signed my name this time?" to which he replied, "I did."

Plaintiff further testified: He was served with a summons in the divorce action on a Saturday in October. The suit had been filed on Friday. Shortly after the summons was served, defendant came to the field where plaintiff was working and handed him a letter from the Barton County State Bank. The letter stated that an emergency had arisen about the $130 note and it would have to be taken care of immediately and that "I should be there not later than nine o'clock Monday morning." Later that day, plaintiff told defendant he would go immediately and pay the note, to which defendant replied, "That won't do any good. My attorney has the papers up there and it don't make any difference if you pay it a dozen times." "She said she was the only one that could save me." She said, "Now, listen, you can be bull-headed if you want to but I am the only one that can save you now. If you want me to save your neck why, you just go down to the bank with me and deed all this property over to me and I will give you the cancelled note and all your papers back and you can go or stay, it don't make any difference." "She said that Mr. Wagamann [the Bank President] said that President Roosevelt had spent years and a lot of money getting that protection for the banks and he said I could get 10 to 20 years." She said that "Mr. Wagamann was as mad as she ever seen anybody and if it hadn't been for Jack [Leavell, defendant's brother,] he (Waga-

mann) would have sent the sheriff right out there Friday afternoon"; that "Jack talked him out of it." She said, "Just deed everything over to her and she would give me back the papers and the cancelled note." Plaintiff replied, "No, I won't do it."

Over the objection of defendant, plaintiff was permitted to testify that on Saturday evening he went to the home of his neighbor and friend, Laurence Mackey, and told Mackey of the above narrated conversation with defendant, and further told Mackey that if he had to go to jail "they would take all of my personal property off of me and * * * she was going to send me there", and that witness gave Mackey $80 to keep for him.

Plaintiff further testified: On Sunday defendant said to him, "You just deed this property all over to me and we will go down to the bank Monday and you deed this property all over to me and put everything in my name and we will go ahead and try to make a go of it or I will give you all your papers back and the cancelled note and you can go on your way, whichever you want to do." Defendant further said to plaintiff that he had treated "her family awful dirty" and he would have to apologize to them. Plaintiff and defendant then went to Jack Leavell's home. While there defendant said to plaintiff, "You sure ought to thank Jack because he saved your neck down at the bank."

On Monday, plaintiff, defendant and Jack went to Lamar. Plaintiff's version of the events there was: Defendant and Jack went to Gordon Boyer's office. Plaintiff went to the bank. Mr. Wagamann told him that the thing he had done was "awful bad" and "reprimanded me heavily". When plaintiff asked how he could straighten it out, Mr. Wagamann said plaintiff should either pay the debt today or give a good note. Plaintiff said to Mr. Wagamann, "I'm going to fix this stuff up today. They will fix you up a good note—they will be over in a little bit and then we will fix you up a good note." Defendant had told plaintiff that after all the papers were signed she would sign the note, but not before. Defendant and Jack

came into the bank and the deeds and bill of sale were then signed. A new note was made. Defendant signed it. Plaintiff asked for the old note but Mr. Wagamann said it should go with the other papers in the bank. Nothing was said at the bank about any criminal prosecution.

On cross examination, plaintiff admitted: "Q. At the time you were there on the farm did you tell Edith that By God she had to get a divorce within 10 days or you were going to? * * * A. I didn't say it in those words but I said it, yes." Plaintiff also admitted that had he not been married the vocational program checks paid to him each month would have amounted only to $67.50 instead of $93.75.

The deeds and bill of sale referred to in plaintiff's testimony were: (1) a warranty deed from plaintiff and defendant Edith May Nichols to defendant Wayne Wirts to the 80 acre tract, (2) a quitclaim deed to said tract from Wirts to defendant Edith May Nichols, and (3) a bill of sale from plaintiff to defendant Edith May Nichols for three cows, one heifer, two calves and four hogs, "and all personal property which is now or may hereinafter be owned and controlled by the undersigned Emory C. Nichols and Edith May Nichols." Edith May Nichols also signed the bill of sale. All of these instruments bear date of October 22, 1951.

Laurence Mackey, over the objection of defendant, testified that on a Saturday night in October, 1951, plaintiff came to his home and there told him that Edith was going to send him to the penitentiary; that plaintiff was worried, didn't know what he was going to do; that plaintiff said "they" could go as far as "they" wanted because he "had signed her name", and she knew about it; that plaintiff gave witness $80 to keep for him; that on Monday night plaintiff returned to witness' home and said that he and defendant had reconciled their differences, that everything was all right, and asked the return of the $80, which witness delivered to him.

Defendant testified: She never at any time threatened to send plaintiff to the peni-

tentiary, it never entered her mind. Plaintiff had refused to talk to her for ten or more days before the letter came from the bank. The first thing plaintiff ever said to defendant about the note was on Sunday, the day after the letter came. He told her that the letter pertained to the note, said he was sorry and asked what he would have to do to fix it up with her. Witness replied, "You carried on like this for ten days and told me I had to get a divorce." Plaintiff told her he was willing to "fix it any way" to prove to her that he did want to stay and "that he was sorry". He said to her, "Now will it be all right with you if I sign this place over to you and everything that is on it? I realize that it is your money that is invested." She replied that it would. Plaintiff then asked her if she would give the bank a good note if he would "sign the place over", and she assented. Plaintiff then suggested that they get Jack Leavell, her brother, to go with them to the bank, so they could deed the property over to Jack and Jack could then deed it to the defendant. They went to Jack's home on Sunday afternoon, where plaintiff told Jack he was sorry for the way he had acted, that he couldn't explain it, he didn't know "what came over" him. Plaintiff further said to Jack that defendant did not want a divorce; that he wanted to "fix it up", and asked Jack to go to the bank with them the next day, Monday which he did. After first attending to a business matter, she and Jack met plaintiff at the bank. Present there also were Mr. Wagamann and defendant Wirts, an employee of the bank. Mr. Wagamann said: "It seems like you folks have had some trouble. * * * Right now I believe Emory (plaintiff) wants to do the right thing. He told me that he was willing to deed everything over to you, the farm and everything that was on it and that will prove it to you." The documents were prepared, read over and signed. Not a word was said about sending plaintiff to the penitentiary.

Defendant further testified that shortly thereafter the relations between her and plaintiff again became strained. Plaintiff told her that he did not care to continue "along there as it was"; that she had better

sell or rent the place to some one else as he did not care to farm it or to stay there, and he asked her to sell the personal property. It was then thought plaintiff could raise the money and "buy me out". Plaintiff had told her he "didn't desire to remain with her." Plaintiff was unable to "raise the money" to buy her out and a sale of the personal property was held, from which the sum of $1,709.99 was realized. On March 15, 1952, "He (plaintiff) walked out and I begged him and followed him to the gate crying and begged him to stay." Several days after leaving, plaintiff sent defendant a list of what he wanted from the place: his clothes, two bird dogs, a drop cord, a pair of boots and his tools. He said that was all he wanted.

Jack Leavell testified: On a Sunday in October, 1951, plaintiff and defendant came to his home. Plaintiff there said, "Well, Jack, I come over to apologize. * * * I can't understand why I did it. There must have been something wrong. I am going to try to do better. I am going to go to Sunday School to see if that won't help the matter. * * * I want you to go along with us and I am going to deed everything over to Edith and make a bill of sale to show that I am sorry for what I've done." Plaintiff said it was her (defendant's) money mostly in the place. "He (plaintiff) was going to deed the place over to me (witness) and that was the intention and then me deed it to her. When we got to Lamar Mr. Wagamann said that they could deed it to Mr. Wirts because he was single and my wife was teaching school and she wasn't with us and we couldn't transfer it all there the same day and that is what we did. * * * There never was a word said about prosecuting; I never did hear that."

John H. Wagamann, President of the Barton County State Bank, testified: Defendant told him she did not sign the note. Witness compared the note with her known signature and determined she had not signed it. Witness asked her if she would pay the note and she said she would see that it was paid. That was all the bank was interested in. Nothing was said about a criminal

prosecution. Defendant Wayne Wirts testified as to the preparation and execution of the title papers. They were drawn at the request of plaintiff and defendant. No threats of any kind were made in his presence.

Clabe Coffman, an instructor in the Vocational Agriculture Program, testified that at the request of plaintiff he assisted in making a list and appraisal of the personal property on the farm for the purpose of determining whether plaintiff could buy it. Nothing was said in his presence about threatening to send anyone to the penitentiary.

During rebuttal, plaintiff admitted: He left defendant on March 15, 1952, and registered at a hotel in Nevada, Missouri. Several days thereafter he gave Clabe Coffman a list of property he wanted from the farm. Coffman brought the property described in the list to him. It consisted of two dogs, tools, drop cord, straw hats, etc.

When rendering judgment, the chancellor orally indicated that he was far from being convinced plaintiff signed the deed and bill of sale under duress. Rather did he believe that defendant did everything within her power to continue to live with plaintiff, but that plaintiff was motivated in making the property transfer for the purpose of effecting a separation and divorce.

■■ There is no disagreement as to the law of the case. Duress by threat, such as will avoid a contract, is tested, not so much by the nature of the threat, but rather by the state of mind produced upon the victim. Duress exists when a person, by reason of threat of criminal prosecution, is bereft of his own free will to such an extent that he is induced to make a contract he otherwise would not have made. Coleman v. Crescent Insulated Wire & Cable Co., 350 Mo. 781, 168 S.W.2d 1060, 1066, 1067, and cases therein cited; Weisert v. Bramman, 358 Mo. 636, 216 S.W.2d 430, 434. It is immaterial whether the threat is of lawful or unlawful imprisonment. Hensinger v. Dyer, 147 Mo. 219, 230, 48 S.W. 912, 915.

■ The evidence to justify the cancellation of a deed must be clear, cogent and convincing. Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807, 813; Basman v. Frank, Mo.Sup., 250 S.W.2d 989, 994. Upon appeal of an equitable action, this court will review the evidence de novo and enter the decree that should have been entered under the evidence, giving due deference to the findings of the chancellor on factual issues, especially those depending upon conflicting testimony. Middelton v. Reece, Mo.Sup., 236 S.W.2d 335, 341; State ex rel. Taylor v. Anderson, 363 Mo. 884, 254 S.W.2d 609, 615.

■■ This is a case in which it is peculiarly appropriate to give due deference to the finding of the chancellor upon disputed factual issues. Plaintiff stands somewhat discredited as a witness by reason of his admission that he surreptitiously signed defendant's name to the notes. His testimony as to threats made by defendant is wholly uncorroborated. His statement to his friend, Laurence Mackey, as to threats made by defendant may have been admissible for the purpose of showing a state of fear of criminal prosecution, but it is clearly self-serving and of no probative value as to his fear being engendered by threats made by her. His admission that shortly prior to the filing by defendant of the divorce suit he had told defendant she had to sue for a divorce within ten days or he would get one, considered in connection with other circumstances in evidence, tends to show that plaintiff was motivated primarily in making the transfers here sought to be set aside for the purpose of effecting a settlement with and separation and divorce from defendant and, by the same stroke, to procure her signature to a new note which the bank would accept in lieu of the spurious note.

We are convinced that the decree was for the right party and should be affirmed. It is so ordered.

All concur.