Frank **LORRAINE** et al., Plaintiffs-
Appellants,

v.

Isabel **DIXON**, Also Known as Isabel Dixon
Deis, Defendant-Respondent.

No. 48813.

Supreme Court of Missouri,

Division No. 1.

April 9, 1962.

John B. Sharpe, St. Louis, for appellants.

Charles E. Wells, St. Louis, for respondent.

HOUSER, Commissioner.

This is an action originally brought by Estella Lorraine, a 77-year-old widow, to set aside a quitclaim deed dated March 12, 1956. The grantee in the deed is Isabel Dixon, a daughter of the grantor. The real estate conveyed was a tract of 1.227 acres in St. Louis County, the grantor's "home place." The grounds for cancellation were that plaintiff signed a quitclaim deed in the mistaken belief that she was signing a will; misrepresentation, and that the deed was given without consideration and upon the basis of an agreement which was subsequently breached and renounced by the parties. Defendant admitted the execution and recording of the quitclaim deed, but denied all other allegations of the petition. After issue joined, and some 14 months after the petition was filed but before trial, plaintiff died. On motion four of her children were substituted in her place as parties plaintiff. At the conclusion of plaintiffs' evidence defendant orally moved the court to enter judgment in her favor. The court sustained the motion on the ground that plaintiffs "failed to make a submissible case under the pleadings and evidence." Following an unavailing motion for new trial plaintiffs appealed from the judgment in defendant's favor.

The petition alleged that on March 12, 1956 Estella, the mother, and Isabel, the daughter-defendant, made an agreement, while the mother was seriously ill in a hospital, for the support and maintenance of the mother for the rest of her natural life, in consideration of which the mother would bequeath the real estate to the daughter by will; that by mistake the mother signed a quitclaim deed believing that she was signing a will; that the mother lived with the daughter continuously after leaving the hospital until July 27, 1958 when the daughter "due to violence to her person and the

insistence of defendant that she no longer support and maintain plaintiff," forced the mother to leave the daughter's residence and seek a home elsewhere, in breach of the agreement; that the quitclaim deed is void for mistake, misrepresentation and lack of consideration; that the agreement for support and maintenance has been breached and renounced by defendant; that defendant collected the rents and income from the property from March 12, 1956 and appropriated them to her own use. The prayer was for cancellation of the quitclaim deed or in the alternative for cancellation of the agreement and an order directing an accounting and reconveyance of the real estate.

In 1955 Estella Lorraine, who had inherited the "home place" from her husband, lived there with three of her eight children: Frank, the oldest son; Fleis, a daughter, and Eugene, an afflicted son. In 1955 Estella underwent a cancer operation. Frank testified that his mother "always" told him she wanted "to give her property to somebody who would take care of Eugene and her"; that after she returned from the hospital she was unable to take care of herself, and he advised her she could not stay there by herself; that someone would have to stay with her and Eugene; that he suggested she turn over the property to him and he would stay there, "fix the place up," with his own money, and take care of her and Eugene. Curiously Frank also testified that two or three times his mother asked him to take the property but he told her he did not want it. Apparently there was a tug of war going on between the children over the disposition of the property. Frank testified that "one was trying to get her to sign papers, the other was trying to get her to sign papers to turn her place over to them; one would tell her not to give it to somebody else and they had her all confused"; that "there was all kinds of papers. Fleis had a paper to sign * * * trying to make a will deeded [?] over to her." Frank had a lawyer fix up a paper "that [Frank would] take care of Eugene

as long as [he] could; and if [he] couldn't take care of him, well, then somebody else would take the place," but when the other children read the paper "they all commenced to holler. Fil and she blew up. * * * [Frank] went home and * * * tore it up in front of Mom, and * * * said, 'They're all against it and you can't do anything about it; so do whatever you feel with it. I want no part of it.'" Frank testified his mother "said she'd will the place to Isabel to take care of her and the boy [Eugene] as long as she lived." Frank feared that if left alone his mother would "fall on the flames of the stove, or something, trying to cook." Since he had to work during the daytime he found it impossible to keep her. He and his sister Isabel discussed the situation and agreed their mother should live at Isabel's house (also in St. Louis County). This was not to Estella's liking. She wished to stay at her own home. At the insistence of the children, however, Estella was taken to live at Isabel's house on or about January 2, 1956. On March 8, 1956 Estella was stricken. She appeared to be unconscious; did not talk, and stared up toward the ceiling. She was suffering from heart trouble, high blood pressure and diabetes. Taken to the hospital that day, oxygen was administered to her. She was "just lying there," motionless, and did not seem to recognize Frank when he entered the room that night. Frank saw a person "walking up the aisle" at the hospital, whom he later learned was Isabel's attorney. Estella remained at the hospital until March 18, 1956. The quitclaim deed from Estella to Isabel was dated March 12, 1956. There is no evidence in this record with respect to the facts and circumstances surrounding the execution of the deed. The hospital record of March 12, 1956 shows Estella Lorraine was cheerful, with no complaints, at 9 a. m.; resting quietly at 10 a. m.; comfortable at 11 a. m.; dosing at intervals at noon; ate well, cheerful and no complaints at 1 p. m.; resting quietly at 2 p. m.; taken to X-ray for chest plates and back to the room between 2:30 and 3 p. m.; "Good day" was noted at 3 p. m. She ate her supper

well at 5:30 p. m. and was resting. The nurse's note at 7 p. m. was "good day." She had visitors at 8 p. m. At 9 p. m. she took a nonsedative tablet. She was not under sedation on that day or any other day during her March, 1956 stay at the hospital. She was taking medicine to control her cardiac condition, and dilation of the blood vessels.

Shortly after Estella left the hospital in March, 1956, Isabel called Frank to her home to discuss finances. According to Frank he and Isabel, Isabel's husband and Estella sat around the kitchen table and talked. Isabel showed Frank the hospital bill of $125 and a long list of the medicines she and her husband had bought, and told Frank he "ought to pay something." He was willing. Isabel suggested he do so by paying rent on the home place where he was living; that the rent money be applied to the payment of the medicine bill. Frank asked his mother how much rent she wanted him to pay. Estella did not know. Frank then offered his mother $20 a month, to which his mother agreed. Nothing was said on that occasion about the mother already having deeded the property to Isabel, but Isabel did say that her mother would stay with her; that Isabel was going to take care of her mother and give her a good life; that "she ain't got very long to live and as long as she lives, she'll have a good home"; that "Mom is going to will me the place to take care of her and Eugene." On that same occasion Isabel said "Mom willed it to me to take care of her and Eugene as long as she lived." Frank heard Isabel tell Estella that she, Isabel, wanted the property deeded to her; that Isabel's father in his lifetime had told Isabel she could build on the ground (at a time when the tract consisted of five acres), so she thought she was "entitled to it" after "she had contracted this deed that she's got now. But she made out there was a will to confuse everybody and nobody knew nothing about it until after [Frank] got a different lawyer to investigate the case; because she told me over the phone that—afterwards, again, that it was

a will that was made right. So [Frank] said 'Well, as long as it's made right, okay, I'm satisfied; somebody has to take care of it.'" Thereafter Frank paid his mother $20 a month for some 10 months. The first three months he paid in cash and took a receipt. The next seven months he paid by checks made payable jointly to his mother and Isabel. Subsequently Frank offered to buy the place from his mother. He offered her "around $5,000, maybe a little better," payable "fifty dollars a month for ten years." His mother laughed and said she would not live that long; that "They claim I ain't going to live a month." In February, 1957 Isabel served Frank with a notice to vacate the home place. This was the first time Frank knew Isabel claimed to own the property. Between April 1, 1956 and July, 1958 Frank made attempts to visit his mother at Isabel's house but "they wouldn't let [him] in." One of the other sisters, living with Isabel, was "supposed to be guarding" Estella. In August, 1958 Estella left Isabel's house and went to visit one of her sons. In September, 1958 Estella went to live with her daughter Clara. Frank visited Estella at his brother's home in August, 1958. He asked Estella "if she was sure * * * that she hadn't made a will; she said, yes, there was a will. They [?] had told her there was a will." Frank said he told Estella "They're all raising the devil about one wants the place, the other one's got papers made out," but to do what she wanted; that it would be "all right" if she gave the property to him (Frank), but that if she gave it to any of the other brothers or sisters "that's all right, too." Frank wrote a note to his mother (she was very hard of hearing) in which he said "I told you that would happen," to which she replied "Yes, but I didn't know it at the time." Frank testified " * * * she said that she wanted her place back in her name, that she'd never took it—she had willed it to Isabel to take care of her and Eugene." Frank testified that at that time (after August, 1958) his mother did not know that Isabel "had a deed to the property."

Another son of Estella, Leon Lorraine, testified he saw his mother at the hospital March 9, 1956; that she was "pretty bad," under oxygen; that after his mother's release from the hospital he and his wife went to see her at Isabel's house; that Isabel opened the door, told them to leave and threatened to get the police after them. Daughter Clara testified to the same experience, and that Isabel called Clara at work and told her if she came to visit her mother, Isabel would have her arrested. Clara testified that about July, 1956, after she had learned from Frank's lawyer that Isabel had a deed to the property, Clara talked to Isabel on the telephone and told Isabel that she had heard Isabel "had Mom's property"; that Isabel denied there was a deed and told Clara "it's a will to take care of Mama as long as she lives and after, to take care of Eugene." Estella was living at Clara's house at the time of her death on November 11, 1959. Between September, 1958 and November, 1959 Isabel sent her mother two $35 rent checks from the home place. Clara did not find a will in her mother's effects after her death.

■ Appellants mistakenly assume that defendant's motion for judgment at the close of plaintiffs' case "concedes every fact which the evidence tends to prove and every fair inference which may be drawn from the facts proved." They argue that a "submissible" case in support of the petition was made. But in this equity case we do not confine ourselves to the law question whether, assuming plaintiffs' evidence to be true, it had substantial value as tending to support the issues tendered. We "look behind such ruling and review the case on its merits without regard to the course actually taken in the court below. Troll v. Spencer, [238 Mo. 81, 141 S.W. 855] supra; Shepard v. Shepard, [353 Mo. 1057, 186 S.W.2d 472] supra; Fullerton v. Fullerton, 345 Mo. 216, 132 S.W.2d 966; 30 C.J.S. Equity, § 579." Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823, 828. This proceeding in equity is here for a decision upon the whole record.

■ From testimony that Estella Lorraine made oral statements that she was going to will the property to somebody who would take care of her and Eugene; that she said "there was a will"; that she said "they had told her there was a will"; that she said she was "going to will" it to Isabel "to take care of her and Eugene"; that she said she "had willed" it to Isabel; that Isabel's lawyer was seen walking in one of the "aisles" of the hospital on March 8, 1956; that Isabel forbade some of her brothers and sisters to see their mother after taking Estella into her home; that after March 12, 1956 Isabel declared she was going to take care of her mother in her home as long as she lived; that after that date Isabel denied there was a deed and stated "Mom willed it to me to take care of her and Eugene as long as she live[s]"; and Frank's conclusion that Estella did not know that Isabel had a deed to the property, it is argued that the only fair inference is, and we are asked to judicially declare, that Estella and Isabel made a contract for the support and maintenance of Estella for life in consideration of Estella willing the property to Isabel, and that by mistake and misrepresentation Estella signed a quitclaim deed to Isabel in the belief that she was signing a will; that Isabel breached the agreement, and that when Estella found out she had signed a deed instead of a will she promptly filed suit to cancel.

Estella wanted to make provision for her own support and maintenance for the rest of her life, and for the care of Eugene. From this record we know that Estella went to live with Isabel, who expressed the intention of giving her mother a good home the rest of her life; that subsequently Estella executed a quitclaim deed to the property to Isabel; that Isabel exercised acts of dominion over the property, and that Estella stayed with Isabel for 28 months but did not remain in Isabel's home for the remainder of her life. There is, however, no proof of any contractual arrangement between Estella and Isabel with reference to the property (other than the

deed). There is evidence of vague expressions of intention on the part of Estella to will it to Isabel or "somebody" who would take care of her and Eugene. There is evidence of inconsistent oral statements by Isabel after March 12, 1956 that Estella was *going to will,* and that she *had willed,* it to Isabel. There are statements by Isabel, obviously false when made, that the property had not been deeded to her. But there is no direct evidence that Estella signed the quitclaim deed in the belief that she was signing a will. Estella died before trial. Her testimony was not preserved by deposition. The notary who took the acknowledgment was not produced as a witness. No witness to her execution of the quitclaim deed testified. We know nothing of the actual facts and circumstances surrounding the execution of the quitclaim deed on March 12, 1956. Nor is there any clear, cogent and convincing circumstantial evidence from which we can confidently make a finding of fact that Estella signed the quitclaim deed in the mistaken belief that she was signing a will. There is nothing to indicate that on March 12, 1956 Estella was unconscious, incapable of understanding what she was doing, or unable to detect a substitution of one document for another, or that she was actually subjected to any such imposition. The hospital record of her condition that day indicates she was aware, rested quietly and had a good day. The transcript is devoid of evidence of misrepresentation. It is true there are circumstances which arouse suspicions with respect to Isabel. Her efforts to keep Frank, Clara and Leon from visiting their mother at Isabel's home after March 12, 1956; her failure to care for her mother for the remainder of her life according to her expressed intention, after the conveyance of the property to her, and her false protestations that the property had not been deeded to her, raise unanswered questions as to Isabel's good faith and intentions. That Estella rented the property to Frank after deeding it to Isabel is strange. Why Estella left Isabel's home is left unexplained. But all of the sus-

picious evidence put together, and all of the doubts and misgivings which arise upon a reading of this record, do not prove the existence of a contract for lifetime support and maintenance in consideration of a devise of the property, the substitution of a deed for a will, misrepresentation and breach of agreement, as charged in the petition. On this transcript we cannot with certainty determine whether Estella and Isabel entered into contractual arrangements for support and maintenance for the life of Estella; whether Estella made a will; if so, whether the deed preceded or followed the will, if there was a will; whether she executed the deed under the mistaken belief that it was a will; whether Isabel forced Estella to leave her home in breach of an agreement. Some of these things are hinted at and might be supposed by stretching the imagination and indulging in speculation, but too many gaps in the proof are left unclosed. The transcript is replete with conclusions and contains much testimony which we deem unreliable. Plaintiffs have not met the requirement that the evidence to set aside a deed be clear, cogent and convincing. In its totality the evidence is confusing and it lacks the definiteness and certitude required as a basis for the exercise of the extraordinary powers of equity in the cancellation of solemn conveyances of land. We agree with the trial court that "The plaintiffs have utterly failed to meet their burden in presenting evidence to prove the agreement pleaded relative to the defendant keeping the plaintiff for the rest of her natural life, that the plaintiff signed a quit claim deed believing that she was signing a will, and that the defendant was the cause of plaintiff's subsequently leaving her home in July of 1958."

The judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.