Marjorie E. PIKE, by her Next Friend, Richard Schaller, Plaintiff–Respondent,

v.

Dorthea L. PIKE, Defendant–Appellant.

No. 62305.

Supreme Court of Missouri, En Banc.

Dec. 15, 1980.

Joseph Y. DeCuyper and Hsiang–Lin Lee, Kansas City, for defendant–appellant.

John H. Norton and William Harrison Norton, Kansas City, for plaintiff–respondent.

RENDLEN, Judge.

Judgment was entered for Marjorie Pike setting aside a deed by which she had conveyed her interest in the family farm to her husband and ordering partition of the land involved. Appealing, defendant asserts (1) the finding of plaintiff's (grantor's) mental incompetence on the date of the deed's execution is not supported by competent evidence, and (2) error in various evidentiary rulings. After opinion in the Court of Appeals,[1] the cause was transferred here for determination as though on original appeal. Mo.Const., Art. V, § 10. A brief statement of facts will suffice at the outset, with detailed recitals of the proof provided in connection with our discussion of the allegations of error.

Four years after their marriage in 1946, Marjorie and Estell Pike acquired a 40 acre farm as tenants by the entirety. In 1965, concerned with her peculiar behavior patterns, plaintiff's aunt insisted she seek medical advice and during January of 1966 she was admitted for a three month stay in the psychiatric ward of Kansas City's Re-

---

1. In its opinion the Court of Appeals, reversing and remanding, stated that plaintiff pleaded "as part of her cause of action a theory that the deed was void because it was not supported by consideration," and noted that plaintiff's theory was want of mental capacity. The Court of Appeals concluded that the medical testimony standing alone did not "constitute clear, cogent and convincing evidence that Marjorie was unable to understand the nature of her act and apprehend its consequences, nor does it show Marjorie did not voluntarily enter into and consummate the transaction when she signed the deed," adding, however, that other grounds appeared supportive of the trial court's judgment setting aside the deed. That plaintiff on re-

mand might "make a case on the lack of consideration coupled with the presence of inequitable incidents." Thus, though the Court of Appeals recognized the evidence demonstrated other reasons that would support the trial court's judgment, the cause was remanded "to give Marjorie the opportunity to present her case on another theory." As explained in this opinion, the record supports the trial court's finding there was no consideration for the deed in question and the evidence, direct and circumstantial, abundantly supports the conclusion that plaintiff's mental and emotional state rendered her an easy mark to be, and she in fact was, overreached and unduly influenced by her husband, grantee in the deed.

search Hospital. Diagnosed as a paranoid schizophrenic, plaintiff underwent electro shock treatments and her condition temporarily improved. The treatments were discontinued that September.

After her release from the hospital, plaintiff returned to her farm home where she remained until 1970. In January of that year she was served with "papers" in her husband's divorce proceeding. It was testified her mental state at that time was confused, but on February 28, 1970, without valid consideration, plaintiff executed a warranty deed conveying her interest in the 40 acre farm to Estell. He in the meantime, proceeding ex parte (plaintiff had defaulted), was granted his divorce on April 10. It is not surprising that he was also awarded custody of the children. On June 20, 1970, Estell married defendant, and subsequently conveyed the 40 acres to defendant and himself as husband and wife. Thereafter, Estell died survived by defendant.

At trial plaintiff alleged the deed of February 28, 1970, was void (1) for lack of consideration and (2) because at the time of its execution plaintiff was legally incompetent by reason of mental illness. Finding that plaintiff had "not been in an overall mentally clear state since 1966," and on February 28, 1970, was legally incompetent, and that "no real consideration was given for the execution of said deed," the court held the deed was of "no legal force or effect." We affirm.

Rule 55.33 provides "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." When variance occurs without objection between pleading and proof, such variance, especially in court tried cases, shall be considered immaterial and the pleadings deemed amended to conform to the proof. See, *Schroeder v. Prince Charles, Inc.*, 427 S.W.2d 414, 421 (Mo.1968). Here, though the proof supports the judgment declaring the deed invalid for reasons somewhat different than those propounded in the pleadings or the trial court's finding, it is clear the deed should be set aside because of undue influence exercised in its procurement. Rule 84.14 requires that an appellate court, in the absence of injustice, should finally dispose of the case. Accordingly, we affirm the trial court's judgment on the showing of undue influence and deem it unnecessary to remand for formal amendment of the pleadings. Evidence pertinent to the issue of undue influence now follows.

Defendant argues that a 1966 medical report admitted in evidence was too remote and of no probative value as to Marjorie's mental state in 1970. However, Edith Ballard, plaintiff's sister, testified that Marjorie's attitude changed after her hospitalization in 1966. She showed no concern for her appearance or for her children whom she permitted to stand on the furniture and on the oven door, and generally "tear up" the house. Edith stated that plaintiff demonstrated a similar lack of interest in money and her home and that her condition deteriorated between 1966 and 1977. At the time of the divorce Edith took plaintiff to an attorney, but ignoring Edith's advice, plaintiff refused to cooperate with counsel. When Edith took her from the farm after the divorce, plaintiff brought her clothes and $300, apparently the only things plaintiff received from the divorce. During the eight months plaintiff resided with Edith, plaintiff had no job, paid no rent, allowed her driver's license to expire and maintained no checking or savings account. Whenever Edith discussed working with plaintiff or when the family visited, plaintiff became nervous and left the room. Edith assigned plaintiff small tasks around the house, but she invariably wandered off abandoning them midway, and neither would she answer Edith's door or phone. Incessantly plaintiff expressed her desire to

go "home" to the farm, and refused to acknowledge the divorce or her husband's remarriage. Although plaintiff occasionally could converse with Edith, the conversation usually consisted of plaintiff's "silly answers" in response to questions directed toward her.

Loretta Easley, a neighbor near the farm, testifying respecting plaintiff's behavior during 1966 through 1970, stated that plaintiff's answers were frequently inapposite to questions propounded to her. She testified plaintiff rarely left the house even to buy groceries, but frequently stood by the door for hours staring outside. Plaintiff's children spent many hours at Loretta's house, yet plaintiff never called to inquire about them and at one time it was necessary for Loretta to drive plaintiff's daughter to the doctor. She also testified that plaintiff condoned impudence from her son, Larry.

Edith Waisner, plaintiff's aunt, testified that in 1963 plaintiff frequently would go blank and when the condition worsened, Edith took plaintiff to a doctor, and thence to Research Hospital. From plaintiff's release from the hospital in 1966, until 1970, plaintiff when engaged in conversation rarely completed her sentences. She never compelled her children to attend school. Edith ceased visiting plaintiff in the fall of 1969 and although she and plaintiff had been very close, on Edith's last visit, plaintiff did not answer the door, but Edith saw a curtain move at the front window and plaintiff's son told her plaintiff was in the house.

Plaintiff's youngest son, John Pike, testified that when plaintiff returned from the hospital in 1966, he was seven years of age. From then until the divorce, plaintiff never looked after him. She condoned his truancies and ceased cooking meals for him. After the divorce, plaintiff left the house taking only the sewing machine. John stated plaintiff's condition deteriorated after the divorce and she attended neither the graduation exercises nor the marriage ceremonies of any of her children.

Virginia Jewell, also a former neighbor of plaintiff's near the farm, testified that she often visited plaintiff from 1967 until the divorce. During these visits plaintiff would stare vacantly and often leave Virginia talking. Virginia was visiting when plaintiff received the divorce summons and petition, on January 8, 1970. Plaintiff refused to believe the contents of the petition when Virginia read it to her, insisting it was a letter. When plaintiff's family arrived to pick her up at the farm following the divorce, plaintiff told Virginia she would return in a few days.

Richard Schaller, plaintiff's brother who provided plaintiff a home during 1972 and 1978, testified that when they picked up plaintiff in 1970 she would not believe she was divorced nor that she had to leave the farm. While living with Richard, plaintiff evidenced a short memory, repeatedly insisted her husband Estell was coming for her, refused to associate with people, could not thaw meat according to Richard's instructions, could not devote attention to television for any length of time, and had no routine sleeping habits. She made erroneous purchases when sent to the store and never completed small tasks assigned her. Her lack of concern for money was exemplified when on the one occasion they persuaded her to attend a social function, she failed to call out her winning at a Bingo game. Each time plaintiff moved out of Richard's house, she never informed him she was leaving.

Larry Pike, plaintiff's son, 19 at the time of the divorce, testified concerning her condition during 1966 through 1970, stating plaintiff slept frequently, cooked only when one of the children complained of being hungry, rarely conversed and often laughed inappropriately. During that period she did not attend her children's functions and never gave Larry a birthday present. Larry could not recall precisely her condition in February, 1970, but believed it remained constant from 1966 through 1970.

Plaintiff's sister–in–law, Pauline Schaller, testified she first met plaintiff after the divorce in 1970 and at that time Marjorie stated, "they told me that my husband divorced me." When Marjorie came to live

with Pauline and Richard, she frequently left unfinished letters written to no one in particular lying about, never finished puzzles she started, and would not waken the Schaller children for school on mornings Pauline and Richard went to work.

The deposition of Dr. George Colom was admitted in evidence. When Dr. Colom observed plaintiff on June 6, 1978, plaintiff was neatly dressed but extremely emotionally liable. She would laugh one minute and cry the next, both inappropriately. Plaintiff rambled and was vague respecting the existence and details of her marriage, exhibiting little knowledge of her children. Plaintiff hallucinated, hearing voices, could not follow simple instructions, felt suspicious of her family and she isolated herself. She exhibited a spotty memory in failing to repeat short sequences of numbers and believing her son, John was four at the time of the divorce, while he was actually ten. Colom diagnosed her illness as schizophrenia, chronic paranoid type, stating that in his opinion plaintiff was incapable of conducting her own affairs in 1978. As an example, he told of her signing without reading the fee responsibility portion of the health form he gave her. He further testified plaintiff had been chronically ill from 1966 through 1978 and was of low intelligence. Although plaintiff might have lucid periods, they would pass quickly and even then plaintiff would be unable to transact business. Plaintiff remembered signing some papers for Estell in 1970, but apparently never understood their significance, as she told Dr. Colom they were "just like the ones I signed for you."

The deposition of defendant's witness, Dr. Sherman Cole, was also received in evidence. His firm treated plaintiff in 1966, and Cole personally observed plaintiff on February 23, 1979. He testified that plaintiff was somewhat vague on her family history, and her behavior was odd in that she laughed inaptly, kept donning and removing her coat, stared prolongedly at inanimate objects, slurred her speech, erred in simple mathematical calculations, answered questions nonresponsively and exhibited no voice inflection. Plaintiff told Dr. Cole she had signed some papers at her husband's behest but forgot to read them. A member of Cole's firm, Dr. John DeMott had recorded his impression of plaintiff on January 14, 1966, as schizophrenic reaction, chronic; paranoid type, a psychosis, characterized by a gross loss of contact with reality. As the equivalent of insanity, it is the most serious personality disorganization. Dr. Cole's records also showed Research Hospital's diagnosis of plaintiff in 1966 as schizophrenic reaction, paranoid type, chronic. At one point in the deposition, Cole stated that at times during the period 1966 through 1979, plaintiff suffered symptoms of schizophrenia, but her illness did not rise to the psychotic level. Later, however, he testified that as of February 28, 1970, plaintiff was "probably suffering from some forms or symptoms of schizophrenia and may have been out of touch with reality."

Defendant testified and called plaintiff's daughter, Gail Roth. Comparing plaintiff's condition from 1966 to the present, Gail stated plaintiff sometimes is much like she was prior to the divorce, but other times, plaintiff appears improved. According to Gail, plaintiff's memory is currently very good. However, Gail testified that on one occasion before 1970 when she became ill, she asked a neighbor to call the doctor because she could not trust plaintiff to do so.

Defendant testified that when plaintiff attended Estell's funeral in April of 1977, she appeared normal and talked with people.

■■■ A deed procured by the exercise of undue influence is rendered invalid. *Wright v. Brown*, 242 S.W.2d 486, 490 (Mo. 1951); *Franklin v. Moss*, 101 S.W.2d 711, 714 (Mo.1937). The test is whether the grantor's free agency and voluntary action were thwarted. While neither direct testimony nor overt acts operating at the moment of the instrument's execution need be shown, *Davis v. Pitti*, 472 S.W.2d 382, 387–88 (Mo.1971); *Houghton v. West*, 305 S.W.2d 407, 412 (Mo.1957), the facts and circumstances from which undue influence

can be inferred must be proved by clear, cogent and convincing evidence. *Edwards v. Maples*, 388 S.W.2d 850, 852 (Mo.1965); *Lorraine v. Dixon*, 356 S.W.2d 96, 100 (Mo. 1962); *Nichols v. Wirts*, 270 S.W.2d 801, 805 (Mo.1954). Further, though inadequacy of consideration is insufficient to warrant relief in the absence of other inequitable incidents, *Meyer v. Schaub*, 266 S.W.2d 620, 624 (Mo.1954), when a person is induced to part with an item of value for little or no consideration, "equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice in the particular case." *Drake v. Greener*, 523 S.W.2d 601, 606 (Mo.App.1975). When want of consideration appears, courts should examine the relationship of the parties, the physical and mental infirmities of the grantor, the unnatural disposition of the property and possible overreaching by the grantee. See *Bolin v. Anders*, 559 S.W.2d 235, 241 (Mo.App.1977). Here the record is replete with indicia of undue influence. The grantor and grantee were wife and husband, and although a divorce action was pending at the time of execution of the deed, the record abounds with evidence demonstrating plaintiff failed to take cognizance of her husband's pending action. While evidence of plaintiff's mental illness on the date of the deed's execution may have been insufficient to invalidate the deed on that ground alone, clearly she was unstable at the time. Further, Marjorie Pike took nothing from the marriage except her clothing, a sewing machine and $300. She received no part of the farm they had owned for 20 years. Looking to these facts and anomalous circumstances in which she signed away her interest in the farm to a grantee who had filed a divorce action against her, we hold the evidence sustained a finding of undue influence sufficient to warrant setting aside the deed.

■ Defendant also complains the trial court erred in (1) the admission of Dr. Colom's deposition without demonstrating his "unavailability" and (2) the receiving of lay testimony that plaintiff was incapable of caring for herself or conducting her affairs. Neither requires protracted discussion.

First, the trial court apparently admitted the deposition on the doctor's alleged presence in Cambridge, Massachusetts, attending classes at Harvard University, and consequent unavailability under Rule 57.-07(a)(3)(C) (a physician engaged in the discharge of his professional duties at the time of trial). Plaintiff ordered to subpoena Dr. Colom's receptionist who it is stipulated would have testified that the doctor was in Cambridge. Defendant maintains the receptionist's testimony would have been inadmissible as hearsay but we need not reach this contention. The record reveals the doctor resided in Fairway, Kansas, and was "unavailable" within the meaning of Rule 57.07(a)(3)(D). Hence there was no prejudice because a correct ruling on the admissibility of evidence will be upheld though the trial court may have justified it for an erroneous reason. *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 586 (Mo. banc 1978).

■ At trial several of plaintiff's lay witnesses testified to plaintiff's peculiar conduct and opined she was incapable of caring for herself or conducting her own affairs. Defendant alleges error in admitting such testimony on the ground no proper foundation was laid and the opinions constituted conclusions of law and facts. In overruling each objection, the trial court stated he would allocate proper weight to the lay opinions. A trial court, sitting without a jury, is given greater latitude in the admission of evidence, as it is assumed the trial judge will not give weight to incompetent evidence. *Spielberg Manufacturing Company v. Direct Sales International, Inc.*, 566 S.W.2d 839, 840 (Mo.App.1978). Moreover, Dr. Colom gave his opinion as to plaintiff's incompetency and various witnesses recounted plaintiff's particular behavioral oddities. While we need not decide if the record supported the trial judge's finding that plaintiff had been incompetent to conduct business affairs since 1966, the lay opinions were relevant to the issue of Marjorie's easy susceptibility to undue influence. We find no reversible error in the trial court's admission of the lay testimony.

The judgment is affirmed.

SEILER and MORGAN, JJ., concur.

DONNELLY, J., concurs in result.

HIGGINS, J., concurs in separate concurring opinion filed.

BARDGETT, C. J., concurs in separate concurring opinion of HIGGINS, J.

WELLIVER, J., concurs in part and dissents in part in separate opinion filed.

HIGGINS, Judge, concurring.

I agree with the principal opinion in affirmance of the judgment for plaintiff on the showing of undue influence in procurement of the deed in question.

I file this separate opinion because I believe the principal opinion also demonstrates that the trial court acted properly when it set aside the deed from Marjorie Pike to Estell Pike on the pleaded ground she was legally incompetent at the time of execution. *See Thompson v. Curators of University of Missouri*, 488 S.W.2d 617 (Mo. 1973).

WELLIVER, Judge, concurring in part and dissenting in part.

I concur in the result of affirming the trial court's judgment.

I respectfully dissent as to the basis of the affirmance. While there is ample evidence of the susceptibility and amenability of Marjorie Pike to undue influence, I view the record as devoid of evidence of the *exercise* of undue influence upon her. The principal opinion states that "we need not decide if the record supported the trial judge's finding that plaintiff had been incompetent to conduct business affairs since 1966 . . . ." I find no difficulty in holding that the record contains ample evidence to support the trial court's findings in this respect.

It is my opinion that the law would be far better served by risking the possibility that we might err in evaluating the evidence in this single case of alleged incompetency, rather than establishing the precedent that a case of undue influence may be made without proof of exercise of the undue influence.