JOHANNA WEISERT, Respondent, v. CARL T. BRAMMAN and ELLA BRAM-
MAN, Appellants.—No. 40745.—216 S. W. (2d) 430.

Division One, December 13, 1948.

Rehearing Denied, January 7, 1949.

*Clem F. Storckman* for appellants.

638

*Hyman G. Stein* for respondent.

[430] HYDE, J.—This is an action for damages for the value of bonds alleged to have been obtained from plaintiff by duress. Plaintiff had a verdict for $10,000.00 actual damages, $3175.00 interest and

$10;000.00 punitive damages. After remittitur of $5000.00 punitive damages, judgment was entered for $19,175.00 from which defendants appealed.

Defendants contend that court should have directed a verdict, as they requested, [431] because plaintiff did not make a case of actionable duress. Plaintiff was the second wife of Albert Weisert, who died at the age of 83 on October 26, 1940. Defendant, Ella Bramman, was his daughter by his first marriage and defendant Carl T. Bramman was her husband. The duress alleged was that defendants demanded bonds ($10,000.00 face value, Laclede Gas Light Company) which plaintiff claimed Mr. Weisert had given to her; and threatened that unless she gave up these bonds "they would file in the Probate Court of the City of St. Louis, Missouri, an information and proceeding charging that plaintiff's said husband was of unsound mind and incapable of managing his affairs." Plaintiff claimed that these and other bonds were given to her in settlement of an antenuptual contract. However, on October 23, 1940, the parties by a written contract, prepared by their lawyers, agreed as to what property plaintiff was to get in settlement of this ante-nuptual contract and that Ella Bramman was to receive these bonds when her father died. They were delivered to her, five days after his death, on October 31, 1940. This suit was commenced on October 17, 1945.

Defendants contend that plaintiff did not make a case for the jury on duress because she had ample time to consider the alleged threat and was advised by competent counsel concerning it. They further contend that even if there was duress, the agreement was not void, but only voidable, and could only have been repudiated by acting within a reasonable time after the duress was removed; and they claim ratification because plaintiff accepted benefits under the contract, made payments required by it, received other property under it and acted in accordance with its terms. We find that these contentions must be sustained.

Plaintiff and Mr. Weisert were married in 1909. At that time Mr. Weisert had four children, the youngest being about fifteen; and plaintiff had a daughter, nine. Plaintiff was nineteen years younger than Mr. Weisert. They made an ante-nuptial agreement which provided that plaintiff (if she survived him) should receive one-fifth of all his property, excepting real estate and personal property belonging to and used in connection with his tobacco business, and that she relinquished all other rights in his estate. The family always understood that the tobacco business would go to the oldest son, Albert Weisert, Jr.; and when he died in 1935 it was agreed that it would go to his family. Mr. Weisert thereafter made a will so providing. Two other children of Albert Weisert, Sr. died prior to 1935 without issue. Mr. Weisert was kind and generous with his family.

He gave each of his children a home and also gave a home to plaintiff's daughter, Mrs. Adeline O'Brien, when she was married. The title to the home in which plaintiff and Mr. Weisert lived was put in both their names and went to her at this death. In 1938, he gave $15,000.00 in Government bonds to his family. This included $1000.00 each to plaintiff, her daughter and her daughter's son; $2000.00 to Ella Bramman and $1000.00 to her son and the rest to the widow ($1000.00) and four children ($2000.00 each) of Albert Weisert, Jr. He also gave Ella Bramman checks aggregating $5500.00 during 1937 and 1938. Carl Bramman was a stock and bond broker and Mr. Weisert made investments through his firm. Family relations seem to have been harmonious until 1940. Defendants came to Mr. Weisert's home for dinner every other Sunday and frequently took Mr. and Mrs. Weisert out in their car.

After the death of Albert, Jr., Mr. Weisert left more of the management of his financial affairs to others. In 1935, plaintiff rented safe deposit Box No. 4384 at the Tower Grove Bank and Trust Company, with Mr. Weisert as deputy, but in 1939 her daughter, Mrs. O'Brien, was substituted as deputy. Mr. Weisert had two other boxes there, No. 1943 rented in 1936 which was transferred to plaintiff in 1938 with Mr. Weisert as deputy; and No. 4428, rented by him in 1938 with plaintiff as deputy. Mr. Weisert had an account at this bank until 1938 which was then closed and, thereafter, all income from his bonds was deposited in an account kept in plaintiff's name. She attended to the collection of his interest coupons and paid household and other living expenses out of this account. The balance in the account at Mr. Weisert's death was paid to his executor. Mr. Weisert went daily at 8:00 A. M. to the tobacco factory, [432] returning at noon, and continued to do so until three days before his death. He formerly did the banking for the tobacco business in the afternoon, but after Albert, Jr. died he sent his grandson to do it. Two or three years before Mr. Weisert died, Mr. Bramman changed some of his investments for him to increase his income and defendants thereafter kept a list of his investments.

In March 1940, Mr. Bramman assisted in the sale of some securities (bank stocks) which were in Mr. Weisert's safe at his home. Mr. Weisert forgot the combination and it was necessary to get a safe company to open it. When that was done, Mr. Weisert's 1935 will was found. Defendants insisted on a new will because it did not mention Mrs. O'Brien and they feared that she would claim an interest. This will disposed of securities which Mr. Weisert did not then own and did not mention others acquired. In checking Mr. Weisert's securities, some could not be found and at that time plaintiff told defendants that Mr. Weisert had given bonds to her. However, she did not then tell them that any of these transfers were in

satisfaction of the ante-nuptial agreement. Plaintiff did disclose her claim to ten $1000.00 Laclede Gas Light Company bonds and ten $1000.00 Dickman Building Company bonds and $15,000.00 of Government bonds. Defendants could not locate $20,000.00 additional Government bonds and plaintiff testified that she "might have said they were given to Helen and her children." (The family of Albert, Jr.) It was later disclosed that plaintiff claimed these bonds also. Mrs. Bramman claimed that her father had promised to leave her the Laclede bonds and they "had quite a discussion about it."

Plaintiff testified that about April 1940 defendants demanded the Laclede bonds and said if she did not give them up they would go to the Probate Court and have Mr. Weisert found "incapable of taking care of his affairs." She said defendants "made that threat twice"; and that the second time was a few days before Mr. Weisert's death after he became sick on an automobile trip on the Sunday (October 20, 1940) before he died. (She later said the first threat was in June 1940.) Mrs. Bramman also demanded that plaintiff pay her $100.00 per month out of the income from her father's bonds. Plaintiff claimed that Mr. Weisert gave her $35,000.00 of the bonds in 1937 ($10,000.00 Laclede, $10,000.00 Dickman, $15,000.00 Government) and gave her the other $20,000.00 Government bonds in 1938. She said Mr. Weisert showed her these bonds in the box which was in her name, in which he then was deputy and in which her daughter was later deputy, and said: "they are yours in place of your dower what is coming from me." His remaining bonds were kept in another box.

Defendants employed a lawyer, Frank Morris, in the summer of 1940. (Mr. Morris said he told them he would not talk to plaintiff but would negotiate only with a lawyer representing her.) Defendants told plaintiff what Mr. Morris said and she told them she already had an attorney. Plaintiff said she had told Mr. Weisert that defendants were going to make trouble for her but did not tell him about their threat to go to the Probate Court. Mr. Weisert told her to go to John Goodwin who had been his personal friend and attorney for many years. She had previously consulted Mr. Goodwin about handling Mr. Weisert's affairs and he had suggested keeping a record of everything received and used; and also told her to make her daughter deputy for the box, in which the bonds given to her were kept, instead of Mr. Weisert. Thereafter, Mr. Morris and Mr. Goodwin had frequent conferences. However, Mr. Morris was busy as a candidate for the nomination for Circuit Judge and after the primary election took a vacation of several weeks. Thus no agreement was reached until October. In the meantime, Mr. Goodwin prepared an agreement (dated August 16, 1940) between plaintiff and Mr. Weisert, by which it was agreed that the $35,000.00 in bonds received in 1937,

the $20,000.00 in bonds received in 1938, and certain specified household and other property given to her in August 1940, were accepted by her in full settlement of the ante-nuptual contract. Mr. Weisert therein confirmed these gifts and plaintiff acknowledged that all her claims were discharged and completely released him and his estate.

[433] The agreement of October 23, 1940, between plaintiff, Mrs. O'Brien and Mrs. Bramman, approved by Mr Weisert, was signed by them after several drafts thereof had been considered by their attorneys. On the same date, Mr. Weisert executed a will (prepared by Mr. Goodwin) which confirmed the gifts to plaintiff stated in the agreement of August 16, 1940. This will stated that their antenuptual agreement had been settled; that the amounts given plaintiff "are less than what she was entitled to under our ante-nuptual agreement"; but that she was "willing to accept the same in satisfaction of said agreement"; and that "I therefore make no further gifts or bequest to her." This will left the tobacco business in trust for the family of Albert, Jr. (valued at $61,200.00 for estate tax.) Mr. Bramman was one of the two trustees and was the sole executor. It left to Mrs. Bramman all of the Mr. Weisert's corporation bonds (valued at $64,685.00 for estate tax, face $122,500.00) and his residuary estate which was less than $5,000.00. It also provided that any beneficiary, who should contest it, should receive nothing.

The agreement of October 23, 1940 provided that the bonds and other property described in the agreement of August 16, 1940 was given to plaintiff in satisfaction of her ante-nuptual contract and these gifts were confirmed by Mrs. Bramman; that plaintiff transferred to Mrs. Bramman the $10,000.00 Laclede bonds to become her property upon the death of plaintiff or Mr. Weisert, whichever should happen first, but reserving to herself the income thereon until that time; and that these and Mr. Weisert's remaining bonds should be deposited in a box at the Tower Grove Bank with access only to plaintiff and Mr. Bramman jointly. Mrs. O'Brien and plaintiff transferred to Mrs. Bramman any interest they might have in the estate of Mr. Weisert. Plaintiff also agreed to pay Mrs. Bramman $100.00 per month out of the income derived from Mr. Weisert's remaining securities during his life. It was further provided that plaintiff would hold harmless the Weisert estate "against the payment of all taxes, assessments and duties of whatsoever kind and nature imposed upon the property herein recited to have been given her or levied upon the transfer of the same to her." Apparently this latter provision was the cause of this and other litigation between the parties.

Plaintiff testified that after Mr. Weisert became ill on October 20th, and defendants made the second threat to have him declared incompetent, she became very nervous and fearful of his death if he knew of the threatened action. She said Mr. Goodwin told her she

had better sign the agreement, saying: "Al is an old man and he can't stand any legal trouble." Defendants, on cross-examination, admitted that Mr. Weisert was of sound mind and not incapable of managing his affairs. Mrs. Bramman said that they were discussing the matter for about three weeks prior to October 23; that plaintiff and her daughter did not want to sign; but "we were not working on her constantly." Mrs. O'Brien said that when plaintiff signed the agreement she was very nervous and upset, was almost hysterical and had lost twenty-five pounds weight. Plaintiff suffered a slight stroke about 1934 and had been under a doctor's care for extreme dizziness. Plaintiff went with Mr. Weisert to Mr. Goodwin's office when he executed the will on October 23rd, Mrs. O'Brien drove them there; but they said the agreement was signed at home in the evening.

On October 25th, the parties met at the Tower Grove Bank, as previously arranged by the attorneys, and the bonds were put in a box under the joint control of plaintiff and Mr. Bramman. At that time Mr. Weisert's condition had become worse and he was in a coma. He died the next day of double pneumonia. After the funeral (October 29th) the parties met again at the Bank on October 31st, by arrangement of their attorneys, and the bonds were delivered in accordance with the agreement of October 23rd. The attorneys for both parties were present at both of these meetings, but plaintiff said she was dazed and still frightened and did nothing but sit there. Mr. Goodwin died in December 1940, and plaintiff thereafter employed another attorney, Albert L. Schweitzer, who arranged for the transfer of the title of Mr. Weisert's automobile to plaintiff by his executor in accordance with the agreements of August [434] 16th and October 23rd. Mr. Schweitzer also assisted in the preparation of the estate tax return and the determination of plaintiff's proportion of the tax under the October 23rd agreement. This was agreed to be $901.30 on the basis of the return made (excluding most of plaintiff's bonds from the taxable estate) and Mr. Schweitzer delivered plaintiff's check to the Collector of Internal Revenue for this amount in January 1942.

However, the government claimed a deficiency on the theory that all transfers to plaintiff were in contemplation of death. Defendants claimed that plaintiff was liable under the October 23rd agreement for an additional amount of $3,203.51 and Mr. Bramman, as executor, brought suit for this amount against plaintiff in September 1944. When the tax deficiency was first claimed, plaintiff employed Mr. Stolar, a lawyer specializing in tax matters to assist Mr. Schweitzer. They worked with defendants' attorneys to contest the deficiency. Mr. Stolar took the position that plaintiff was not liable for any part of the estate tax. (He claimed there was no consideration for the October 23rd agreement and that its terms were not broad enough to

impose liability.) No claim of duress was made until this suit was filed, October 17, 1945. At that time, an amended answer was filed in the executor's suit against plaintiff alleging duress as a defense.

Defendants' evidence was that they employed Mr. Morris because plaintiff would not cooperate in locating the $20,000.00 of Government bonds. Mrs. Bramman testified that plaintiff told her at the Tower Grove Bank in May 1940, when they were discussing the bonds, that "dead men tell no tales"; and said "don't ever think I am not going to get while the getting is good." Defendants did not deny that they mentioned going to the Probate Court as one of their possible courses of action but denied saying anything about it in October 1940.

Plaintiff relies on Mississippi Valley Trust Company v. Begley, 298 Mo. 684, 252 S. W. 76; White v. McCoy Land Company, 229 Mo. App. 1019, 87 S. W. (2d) 672; Furman v. Gulf Insurance Co. of Dallas, Texas, 152 Fed. (2d) 891, (C. C. A. 8); Coleman v. Crescent Insulated Wire & Cable Co., et al., 350 Mo. 781, 168 S. W. (2d) 1060. However, in none of these cases was the person claiming duress represented by counsel who conducted negotiations for a contract with counsel for the other parties over a period of several months. Plaintiff also had the advice of her daughter who was a mature married woman and who also signed the contract. The modern rule of duress as established by the above cases is that "duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim"; and that "the ultimate fact in issue is whether the alleged injured party was bereft of the free exercise of his will power; and of which, the means used to produce such state of mind the age, sex, capacity, situation, and relation of the parties, are all evidentiary." [Coleman v. Crescent Insulated Wire & Cable Co., supra.] However, it is also the general rule that a claim of duress cannot be sustained where there is full knowledge of the facts of the situation and ample time and opportunity for full and free investigation, deliberation and reflection. [Tanner v. West, 339 Mo. 738, 99 S. W. (2d) 7.] Plaintiff herein had at least from June (perhaps March) to October for deliberation and reflection. She was in a position to have full knowledge of the facts because she had been in complete control of Mr. Weisert's bonds and bank account for several years; and she had the benefit of able counsel for consultation and investigation. Her attorney first fortified her claims by preparing and obtaining a written agreement from Mr. Weisert confirming the claimed oral transfers; and he then negotiated with defendants' attorney from August until October. These negotiations were carried on to a considerable extent by correspondence which shows careful consideration of a basis for settlement and discloses that the final draft thereof was agreed upon between the lawyers by October 16th, a

week before it was executed. It was prepared by plaintiff's attorney and was not signed in the presence of defendants.

"Any dispute which can be the subject of an action or a suit may be the [435] basis of a compromise, and its settlement will afford a consideration therefor." [11 Am. Jur. 250, Sec. 5.] If a claim is asserted in good faith, the merits of the controversy will not be considered after the parties have agreed upon a compromise. [11 Am. Jur. 251-254, Sec's 6-7.] We think that the evidence considered most favorably to plaintiff shows that there was a basis for a compromise agreement. Even though there were no grounds for a charge of mental incapacity, there was a reasonable basis for claiming that the transfers (or some of them) were the result of undue influence. Plaintiff was acting in a fiduciary capacity in handling Mr. Weisert's bonds and income under circumstances which might have made a prima facie case. [See Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772; Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400.] There was certainly room for argument as to the amount plaintiff was to receive in settlement of her ante-nuptual contract, and whether she was entitled to more than the one-fifth, specified, even though two of Mr. Weisert's children had died without issue. It was also a matter for controversy as to what extent he had reduced his estate by unequal gifts to members of the family, and whether these were all out of principal or partly out of income, as well as the actual value of the bonds claimed by plaintiff as compared with the value of those retained. Our conclusion is that the evidence considered most favorably to plaintiff's contentions does not afford a basis for a reasonable inference that (in view of the negotiations conducted by her attorney over such a period) plaintiff was bereft of free will and the power of voluntary action and acted under duress, as that term is defined and applied by the courts, when she agreed to this settlement.

Moreover, we think there is another reason why the Court should have directed a verdict in this case. A party, who is entitled to avoid a contract on the ground of duress should repudiate it promptly after the duress has been removed. Silence and acquiescence for a considerable period thereafter, action in accord with it, and acceptance of benefits under it, amount to a ratification. [17 Am. Jur. 902, Sec. 25; 35 A. L. R. 868 annotation; 17 C. J. S. 530, Sec. 169; Wood v. Kansas City Home Telephone Co., 223 Mo. 537, 123 S. W. 6; Bushnell v. Loomis, 234 Mo. 371, 137 S. W. 257; Deibel v. Jefferson Bank, 200 Mo. App. 541, 207 S. W. 869; Farmers State Bank v. Day, (Mo. App.) 226 S. W. 595; Bray v. Haskins, (Mo. Sup.) 229 S. W. 1074; Sheppard v. Travelers Protective Assn., 233 Mo. App. 602, 124 S. W. (2d) 528; Arthur Fels Bond & Mortgage Co. v. Pollock, 347 Mo. 853, 149 S. W. (2d) 356; Koenig v. Koenig,

(Mo. App.) 191 S. W. (2d) 269.] Certainly any duress claimed in this case ended when Mr. Weisert died. Five days after his death, plaintiff and her attorney met with defendants and their attorney, and ended the joint control arrangement for all of the bonds. The bonds now claimed were then delivered to Mrs. Bramman. Thereafter, when Mr. Goodwin died, plaintiff employed another attorney and through him procured the transfer of the title to the automobile which she was to get under the settlement. Other matters were settled in accordance therewith and plaintiff paid the proportion of the Federal taxes which her attorney advised her was due under the contract. She and her attorneys cooperated with the executor and his attorney to induce the Federal authorities to exclude the property she received under it from the taxable estate. No claim of duress was made for five years, lacking one week, from the time the contract was signed. This was more than a year after the executor's suit was filed for the additional amount claimed to be due the estate because of greater tax imposed. Thus it has the appearance of an afterthought, originating after the commencement of that suit and after plaintiff had continued to act in accordance with the terms of the settlement throughout the previous years.

The judgment is reversed. All concur.