David E. HARRIS, Plaintiff,

v.

Richard Milhous NIXON, Individually and in his Official Capacity as President of the United States, Robert E. Hampton, Individually and in his Official Capacity as Chairman, United States Civil Service Commission, United States Civil Service Commission, Veterans Administration, an agency of the United States, Donald E. Johnson, Administrator of Veterans Affairs, Defendants.

Civ. A. No. C-2028.

United States District Court,
D. Colorado.

March 4, 1971.

§§ 7151, 7154, the First Amendment to the United States Constitution, and 28 U.S.C. § 1343(4), seeking redress for infringement of plaintiff's constitutional rights to be free from religious discrimination. Essentially plaintiff claims (1) that his resignation as a probationary employee of the United States was brought about by coercion, intimidation, or deception rendering that resignation involuntary; (2) that the administrative proceedings sought to be reviewed were not conducted in substantial compliance with the applicable statutes and regulations, were arbitrary and capricious, and thus denied him due process of law; and (3) that the proposed termination of his employment which led up to his resignation was based on an evaluation of his work performance which was unfair and constituted discrimination because of religion.

I

The underlying facts of this dispute are as follows: Plaintiff was appointed to the position of Supervisory Chemist, GS–11, Veterans' Administration Hospital, East Orange, New Jersey, on January 3, 1967. After three months of employment, plaintiff's performance was evaluated as "satisfactory." There is no objective evidence in the record of any friction between plaintiff and Dr. Miriam H. Field (Chief of Laboratory Services to which plaintiff was assigned) prior to October 1967.[1] In the early part of October Dr. Harris confidentially requested information from a personnel officer as to transfer procedures. Then, by letter dated October 27, 1967, plaintiff's mother, Mrs. Helen M. Harris, addressed several very strong complaints to Dr. Field concerning plaintiff's work situation.[2]

James H. Seckinger, Stapleton-Globeville Legal Services, Denver, Colo., for plaintiff.

James L. Treece, U. S. Atty., Denver, Colo., for defendants.

### MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is an action seeking judicial review of administrative action pursuant to 5 U.S.C. § 701 et seq., and also an original proceeding pursuant to 5 U.S.C.

---

1. Dr. Harris believed, according to his testimony, that he was being discriminated against during this period. Dr. Field testified that her evaluation of his fitness gradually changed during this period.

2. Although neither plaintiff nor the administrative hearing officers have suggested this fact as a possible explanation for subsequent ensuing events, there is some evidence that Dr. Field reacted negatively to this letter and tended to blame plain-

On October 31, 1967, Dr. Field signed a request for two hours of Compensatory Overtime on behalf of Dr. Harris (plaintiff) which request included the following comment:

> Due to the shortage of personnel because of long-term illnesses, and the loss of a temporary employee, Dr. Harris has spent many hours overtime to keep the laboratory operating efficiently.

Then, on November 2, 1967, Dr. Field informed plaintiff orally that his work performance as a probationary employee to date had not been satisfactory. This adverse evaluation (including several specific points) was confirmed in writing by a memorandum dated November 3, 1967 (apparently received by Dr. Harris on November 6). Dr. Harris responded to this evaluation by his memorandum dated November 12, 1967, in which he described Dr. Field's evaluation as both unfair and incorrect and disputed certain specific issues regarding his work performance. Dr. Harris also inquired at this time as to what rights he had to appeal this adverse evaluation.

On Friday, December 1, 1967, plaintiff was informed by Dr. Field that she intended to recommend that he be separated from his position during his probationary period. At about 4:15 p. m. that same day, plaintiff contacted the Personnel Office of the hospital and was interviewed by Charles C. Walter, Personnel Officer; Mr. Richard Mc-Kinley, Personnel Management Specialist, who serves as personnel specialist to Laboratory Service; and Miss Eleanor E. Feldmann, Assistant Personnel Officer of the hospital. According to the affidavits of Mr. Walter and Miss Feldmann (Mr. McKinley had to leave the conference early) Dr. Harris desired to know his rights as an employee of the hospital and his rights as a citizen of the United States. Mr. Walter stated that he was not an attorney and could not therefore advise Dr. Harris of his rights as a citizen, but that as Personnel Officer he was in a position to advise Dr. Harris of his rights as an employee of the Veterans Administration. Several extracts from the Federal Personnel and Veterans Administration Manuals were then read, explained and discussed with Dr. Harris. Among these was an extract from VA Manual: MP–1, Part I, Chapter 7, "Equal Employment Opportunity Program," paragraph 705.01, which states:

> a. Any aggrieved *VA employee, former employee,* qualified applicant, or a duly authorized representative of such employee or applicant, may file a written signed complaint [of religious discrimination, among other things] under the provisions of Part II, Executive Order 10925. The term "employee" shall include all VA employees wherever located, whether in or outside the competitive service except aliens employed outside the limits of the United States. The complaint must be filed within 90 days

---

tiff. A few excerpts from this letter are illustrative:

> Shortly after we arrived we had a Sunday dinner invitation, the hostess would pick us up. Shortly before we were to go, the Lab phoned, machine not working—Mr. T. said to call Dave (plaintiff) to fix it—he lived closer—so Dave trots off to Lab and I get upset—my day spoiled! * * *
>
> * * * * *
>
> Dave is overworked, under paid and knocking himself out, the conditions of these past months has me worried about his health, the long hours, the strain, the frustration. His Supervisory Position should have given him the authority to run the Lab as he felt best to achieve the highest efficiency and productivity. He apparently has little say, as was shown that day when he was on sick leave and you came over that evening to what I thought was a social call, but for two-hours it was business, Roy going to you, without first bringing the problem to Dave, you agreed with Dave that he was right, yet it all ended up by Roy getting his demands! Dave giving up the more qualified person to accept the less qualified person.

Letter to Dr. Miriam Field, from Mrs. Helen M. Harris, dated October 27, 1967.

from the date of the alleged discrimination, unless such time is extended for good cause shown by the complainant to the EPO, DEPO, or the Executive Vice Chairman.[3]

After discussion of the above quoted regulation, Mr. Walter discussed "the procedure that would take place upon termination during probationary period, * * *." Mr. Walter continues:

Dr. Harris then asked what effect this action would have on his official personnel folder, and I advised him that the permanent record in his Official Personnel Folder would reflect that he had been terminated during probationary period. It was at this point that Dr. Harris expressed concern about his permanent record being marred. * * * It was also at this point that Dr. Harris inquired as to what would happen if he resigned. I told him that an employee could resign at any time, and explained to him the two courses whereby he could submit his resignation.

(1) It was the employee's perrogative [sic] and right to tender his resignation at any time; that if he resigned after the official action was under way to terminate him during probationary period, i. e.: even after Dr. Field may have submitted a recommendation for termination, his official record would reflect that he had resigned while action was pending to terminate him during probationary period.

(2) If he resigned prior to the initiation of any formal action, or recommendation to terminate, his record would only reflect his reason for resignation and his record would not contain any record of the intent to terminate.

On at least four different occasions, during the course of this discussion, I made it clear to Dr. Harris that it was not my intent, nor was he being coerced or intimidated to make a decision relative to resignation. * * * At this time Dr. Harris acknowledged in his discussion, and so stated, that he was not being intimidated or coerced into resignation, and that he would consider all factors that we had discussed, and after he had had a chance to review them in his own mind, and to seek counsel, he would render his decision, and advise me of that decision.

* * * * * *

Near the close of this discussion, Dr. Harris indicated that there was a possibility of discrimination because of religion, but he would not elaborate. This was my first indication that discrimination might be a factor. * * *

Miss Feldmann's affidavit corroborates Mr. Walter's account of this conference in all substantial respects.

The following Monday, December 4, 1967, at approximately 7:55 a. m. Dr. Harris tendered his resignation to Mr. Walter. Paragraph 4 of the resignation letter contained the following:

4. The boundaries of my responsibilities have been clouded and shifted in such a manner that questions of the possibility of favoritism and even the possibility of discrimination because of religion must be raised.

---

3. Plaintiff apparently contends that this provision was not read to him, or in any event not adequately explained to him. Duncan E. Walton, Alternate Deputy, Equal Employment Opportunity Officer, reports the following from a meeting with Dr. Harris on December 7, 1967 (the 3rd of three such meetings):

In addition, I discussed with him his contention that he had to resign his position in order to initiate a discrimination complaint. Although portions of MP–1, Part I, Chapter 7, relative to his rights to file a complaint had been reviewed with him by the Personnel staff on December 4th, he believed it necessary to resign in order to pursue his desire for some corrective action. When I made it quite clear that this was not necessary, he stated that he had been misinformed about "his rights."

It is this basis upon which plaintiff rests his contention that his resignation was involuntary.

The letter ended with:

> By this letter of resignation, I specifically DO NOT waive my rights as a citizen of the United States to bring any of the circumstances of my employment to the attention of appropriate government officials.

As soon as Dr. Harris left Mr. Walter's office, Mr. Walter informed the Hospital Director of the letter of resignation and particularly paragraph 4 thereof. Arrangements were made for Dr. Harris to be counseled regarding his right to file a complaint of religious discrimination.

On December 6, 1967, after various meetings with Hospital personnel officials, Dr. Harris submitted his formal complaint of religious discrimination, which stated in part:

> * * * Dr. Field has continued her practice of treating me differently from another employee. This employee is of the same religion as Dr. Field, whereas I am of another faith. (After citing a few specific instances of alleged differential treatment, the statement continues): For these reasons, I raised the question of discrimination in my letter of December 4, 1967.

On February 1, 1968, plaintiff wrote to the Civil Service Commission alleging that elements of coercion and deception were present in his resignation. Although plaintiff was a probationary employee at the time he received notice proposing to remove him, the Commission accepted his appeal of his separation by resignation for consideration under its regulations (5 C.F.R., Part 752, Subpart B) since at the time the resignation became effective, he had completed the required probationary period of employment.

Various and extensive administrative proceedings ensued to determine the merits of plaintiff's claims. Plaintiff brings this action to review those proceedings and to seek redress for the alleged infringement of his constitutional rights.

█ It is to be pointed out here that our authority is strictly limited. Ours is a review function in which the inquiry is whether there is substantial evidence to support the finding, whether there has been an abuse of discretion and whether there has been a failure to observe the law (regulations).

## II. INVOLUNTARY RESIGNATION

Plaintiff contends that his resignation was submitted under pressure and without full knowledge of the facts and without ample time and opportunity for a full and free investigation, deliberation, and reflection upon the procedures available to him, and that therefore his resignation was involuntary under the principles set forth in Paroczay v. Hodges, 219 F.Supp. 89 (D.D.C.1963) and the Civil Service Commission regulations, Federal Personnel Manual 752–1, Subchapter S–2. The essence of plaintiff's claim appears to be (1) that he did not have full knowledge of the facts of his situation, and (2) that he was not given ample time for full and free investigation, deliberation, and reflection.[4]

With regard to (1), plaintiff claims that (a) he was not informed of his right to file a claim of religious discrimination; and that had he known of this right, he would not have resigned, but would have challenged the hospital to proceed with the proposed termination "in the face of the pending formal complaint of religious discrimination."

█ There are cogent reasons why this claim cannot be upheld. *First*, as

4. Paroczay v. Hodges, 219 F.Supp. 89 (D.D.C.1963), quotes the following, at 94: * * * "it is * * * the general rule that a claim of duress cannot be sustained where there is full knowledge of the facts of the situation and *ample*

*time and opportunity for full and free investigation, deliberation and reflection.*" Weisert v. Bramman, 358 Mo. 636, 216 S.W.2d 430, 434 (1948) (Emphasis added.)

a factual matter the administrative proceedings sought to be reviewed here resulted in a finding that plaintiff was in fact informed of his right to file a complaint of religious discrimination. Two personnel officers stated in their affidavits that an extract from VA Manual: MP–1, Part I, Chapter 7, "Equal Employment Opportunity Program," para. 705.01, quoted above,[5] had been read and explained to plaintiff. This Court is unable, in view of this, to say that the administrative findings based on this evidence are arbitrary or an abuse of discretion.

*Second,* plaintiff did not mention even the possibility of a claim of religious discrimination until near the end of the December 1, 1967, interview.

> Dr. Harris did not inquire during this conference as to his rights to appeal his possible termination on the grounds of discrimination because of his creed. It was not until the close of this conference that he mentioned the possibility of discrimination because of creed, and when asked to elaborate, he declined to do so stating that he had not yet resolved this issue in his own mind. It was not until Monday, December 4, 1967, in his letter of resignation that discrimination was raised in any specific manner.[6]

Plaintiff's claim (2) that he was not given ample time for full and free investigation, deliberation, and reflection, is based on his contention that he was led to believe that he had to submit his resignation immediately or face the possibility that formal termination proceedings would be instituted and that fact would be entered in his official personnel folder. However, there is nothing in the record to indicate that anyone suggested or even knew when a formal recommendation to terminate would be executed.[7]

Furthermore, Dr. Harris in fact took at least 63 hours—from the time Dr. Field informed him of her intent to recommend termination until the time Dr. Harris actually submitted his resignation—for investigation, deliberation, and reflection. As mentioned earlier, he had been fully informed of his rights.

In the case of Paroczay v. Hodges, 219 F.Supp. 89 (D.D.C.1963), upon which plaintiff relies, the court explicitly stated that "the essential reason why the resignation must be held involuntary is that the choice was one which plaintiff was forced to make *immediately,* without time and opportunity—which was specifically requested and denied—'for full and free investigation, deliberation and reflection,' * * *." In that case, plaintiff stated:

> "the said J. J. Davis said, 'if you do not resign now, I will press charges [of homosexual conduct] immediately. As soon as I go into the front office, I will start proceedings;' I asked the said J. J. Davis for a few days to think the matter over and he said, 'No, once you leave this office, I will start proceedings right now. Sign now;' without advice of counsel or an opportunity to discuss the matter with my wife or friends, and being apprehensive of being held up to public obloquy, I signed a 'form' resignation * * *." *Id.* at 92.

The court recognized the distinction between the case before it and the case of Rich v. Mitchell, 106 U.S.App.D.C. 343, 273 F.2d 78 (1959), in which,

> There was no demand for an immediate resignation under threat of immediate charges. The employee was not told to 'sign now.' He was given three days within which to consider the course he would adopt. A request for opportunity to consult family and

---

5. *See* text accompanying Note 3 *supra.*

6. Affidavit of Eleanor E. Feldmann, February 9, 1968. Exhibit 5.

7. The evidence in the record of a memorandum from Dr. Field to the personnel

officer which recommends Dr. Harris' separation as of December 15, 1967, is not necessarily relevant to the issue of the voluntariness of Dr. Harris' resignation, since Dr. Harris did not know of this memorandum until some time later.

friends was not rejected. * * * " Paroczay v. Hodges, *supra*, 219 F.Supp. at 93.

In the present case, where plaintiff was facing only a contemplated recommendation of termination, where it has been determined that he was adequately informed of his rights, where he was given adequate opportunity to consult with his family and friends, where no one. demanded, requested, or even suggested that he resign, and where he was specifically advised that no one was attempting to coerce a resignation from him and that the decision must be his, it has to be concluded that the administrative tribunal did not abuse its fact-finding discretion or depart from the law in finding Dr. Harris' resignation to have been voluntary.[8]

## III. SUBSTANTIAL COMPLIANCE WITH APPLICABLE STATUTES AND REGULATIONS

Plaintiff contends that the adverse administrative evaluation of his performance and his subsequent proposed termination were not conducted in substantial compliance with the applicable statutes and regulations; in addition, he claims that these proceedings sought to be reviewed were arbitrary and capricious and denied him due process of law. Plaintiff's specific contentions in this regard will be discussed below.

■ *First*, plaintiff claims that the proposed termination of his employment violated 5 C.F.R. § 1315.803 and § 1315.-804 and was arbitrary and capricious. Plaintiff interprets these regulations as requiring that a probationary employee may be terminated *only* if his *work* is unsatisfactory, and he claims that the evidence establishes that his work was satisfactory. This claim is without merit for the following reasons:

(a) The cited regulations provide essentially that an agency "*shall* terminate [a probationary employee's] services during this period *if* he fails to demonstrate his *fitness* or his qualifications for continued employment," 5 C.F.R. § 1315.803, and that "[*w*]*hen* an agency decides to terminate * * * because his work performance *or conduct* during this period fails to demonstrate his *fitness* or his qualifications * * *, it shall terminate his services by notifying him in writing. * * * " *Id.* § 1315.-804. Thus, the cited regulations provide a standard for when an agency *must* terminate a probationary employee; not a standard for determining when it may not.

■■ (b) It appears from these regulations that a probationary employee may be terminated when his *conduct* fails to demonstrate his *fitness*, even though his work performance may be satisfactory. There is clearly sufficient evidence in the record from which the agency was justified in concluding that Dr. Harris was simply not fit for the position. For example, it is possible that Dr. Harris was over-qualified for his position. He appeared to be well-qualified, competent, and hardworking. Yet he did not appear to get along well with his supervisors, and he seemed to resent the fact that Mr. Tabenkin had greater authority with only a B.S. degree in Chemistry.

---

8. The Civil Service Commission regulations, Federal Personnel Manual 752–1, Subchapter s–2, provide in part:

* * * the general principle is that an action is voluntary if the employee understands the transaction, is free to choose, is given a reasonable time to make his choice, and is permitted to set the effective date. Under this principle, the resignation of an employee whose mental condition precluded him from exercising free will, or from understanding the transaction, would be an involuntary resignation and thus void. When there is substantial medical and other evidence that an employee is *non compos mentis*, therefore, the agency should not encourage the employee's resignation. * * *

While Dr. Harris' claim all along has been that he did not understand the transaction, despite the agency's efforts to inform him of his rights, he does not contend and there is no indication in the record that he was *non compos mentis* at the time. Thus, the administrative determinations that he was aware of his rights were not arbitrary.

(c) Plaintiff was not terminated from his position by the agency. He resigned, and as discussed above, his decision to resign was determined to have been voluntarily made. The fact that he resigned and was not terminated renders his legal position more difficult. It, of course, increases his burden in court.

■ *Second,* plaintiff asserts that the November 3, 1967, evaluation of his performance violated Civil Service Commission Regulations and 5 U.S.C. § 4301 et seq. However, the cited statutory provisions do not operate to enlarge the limited rights given to probationary employees and are not applicable here. *See* Golding v. Weeks, 96 U.S.App.D.C. 192, 225 F.2d 31 (1955), cert. denied, 350 U.S. 918, 76 S.Ct. 207, 100 L.Ed. 804, rehearing denied, 350 U.S. 943, 76 S.Ct. 312, 100 L.Ed. 823 (1956).

■ *Third,* plaintiff complains of violation of a Civil Service Commission Regulation which states:

> The supervisor of each employee serving a probationary period must, no earlier than the beginning of the ninth month nor later than the end of the tenth month of such period, submit through supervisory channels a signed statement certifying either that the employee's performance, conduct, and general trace of character have been found satisfactory or that they have been found unsatisfactory. Federal Personnel Manual, Chapter 315, Subchapter 8, PROBATION, Sec. 8–3(5).

Plaintiff maintains that the Chief, Laboratory Service, rather than plaintiff's immediate supervisor, the Laboratory Coordinator, on November 2, 1967 (the last day of the tenth month of plaintiff's probationary period) had a conversation with the plaintiff about his work performance. That conversation was confirmed in writing by the Chief (Dr. Field) in a memorandum dated November 3, 1967 (the beginning of the elev-enth month of plaintiff's probationary period), and that memorandum was given to plaintiff on November 6, 1967. Assuming, as both parties before us do, that Dr. Field's memo to Dr. Harris was the required document to be submitted through supervisory channels, we do not feel that its lateness or the manner in which it was produced constituted substantial noncompliance with the cited regulation. Further, the record discloses that Mr. Tabenkin, who was plaintiff's immediate supervisor, submitted a memorandum to Dr. Field on November 3, 1967, evaluating Dr. Harris.

■ *Fourth,* plaintiff contends that 5 U.S.C. §§ 5542, 5543, and 5 C.F.R Part 610 were violated because certain circumstances which were allowed to get out of hand at the hospital added to his personal work load, forcing him to work overtime without compensation. However, overtime was neither officially ordered nor approved, and there is every indication from the record that plaintiff undertook these efforts voluntarily, and that these were a result primarily of his own sense of professional dedication. As such, we do not feel that these occurrences fall within the purpose or intent of the cited statutes and regulations, and no violation or substantial noncompliance has been shown.

## IV. RELIGIOUS DISCRIMINATION

■ Perhaps the major thrust of plaintiff's complaint is that the proposed termination of his employment which led up to the resignation was based on an arbitrary, unfair evaluation of his performance which constituted discrimination because of religion. The essence of his argument is that Dr. Field, Chief of Laboratory Services, treated him unfavorably and unfairly in order to favor Mr. Phillip Tabenkin, Laboratory Coordinator, whose position was allegedly under consideration for being abolished.[9]

---

9. There is, however, some evidence that the hospital director had decided against redesignation of Mr. Tabenkin's position long before many of the allegedly discriminatory acts took place.

It is claimed that this differential treatment had a religious basis inasmuch as Dr. Field and Mr. Tabenkin are both of the Jewish faith while Dr. Harris is a Catholic.

It is to be noted that many of Dr. Harris' quarrels with the administrative findings and conclusions relate to his contentions regarding the alleged basic unfairness of his total job situation at the hospital. For instance, he claims that he was not given an honest picture of what his job situation would be when he accepted the position and was thus deceived into taking the position. He also devotes substantial portions of his lengthy arguments to attempts to establish that his work was in fact satisfactory, although he was rated unsatisfactory by Dr. Field. However, evaluating the merits of Dr. Field's administrative decisions is not before this Court, except insofar as it may involve religious discrimination, as alleged.

It is true, as plaintiff points out, the record clearly shows that he was treated "differently" than Tabenkin. Mr. Tabenkin, for example, was not given an unsatisfactory performance rating by Dr. Field, and there is some indication that she gave Mr. Tabenkin support in and for his position. It does not follow, however, that the differential treatment had a religious or other impermissible basis. There is evidence in the record, for example, of a deterioration in the working and personal relationship between Dr. Harris and Dr. Field.[10] On the other hand, there is evidence that Dr. Field relied heavily on Mr. Tabenkin to perform administrative tasks. In other words, they had a good working relationship.

It is not necessary to conclude that this is *the* explanation of whatever differential treatment was in fact received by Dr. Harris. It is sufficient to say that the various administrative agencies which carefully considered the matter did not find that the evidence would support a claim of *religious* discrimination, and from a careful review of the extensive record in this case, this Court is not able to say that the administrative determinations were arbitrary or capricious.[11]

Accordingly, then, the cause before us is determined to be lacking in merit. The complaint and cause of action are dismissed.

---

10. *See, e. g.,* Note 2 *supra* and accompanying text.

11. There was also substantial evidence in the record to the effect that there positively was not religious discrimination in this case. Such was the conclusion of an investigative officer who interviewed various colleagues and co-workers of Dr. Harris and Dr. Field.

Plaintiff has complained at various points in the administrative proceedings that the evidence supporting his point of view has been arrogantly ignored. *See, e. g.,* Letter to the Honorable Richard M. Nixon, President, June 24, 1969. However, a careful re-examination of the evidence presented at the administrative levels indicates that, from any objective point of view, the evidence is simply insufficient in law or in logic to support plaintiff's contentions.